**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COUNTY OF CAPE MAY, a political | ) |
| Subdivision of the State of New Jersey; | ) |
| COUNTY OF CAPE MAY CHAMBER | ) |
| OF COMMERCE, a New Jersey Nonprofit | ) |
| Corporation; CLEAN OCEAN ACTION, | ) |
| a New Jersey Nonprofit Corporation; | ) |
| the GARDEN STATE SEAFOOD | ) |
| ASSOCIATION, a New Jersey | ) |
| Corporation; GREATER WILDWOOD | ) |
| HOTEL AND MOTEL ASSOCIATION, a | ) |
| New Jersey Nonprofit Corporation; | ) |
| LAMONICA FINE FOODS, | ) |
| a New Jersey Limited Liability Company; | ) |
| LUND'S FISHERIES, a | ) |
| New Jersey Corporation; SURFSIDE | ) |
| SEAFOOD PRODUCTS, a New Jersey | ) |
| Limited Liability Company, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. |
| | ) |
| UNITED STATES OF AMERICA; | ) |
| UNITED STATES DEPARTMENT OF | ) |
| THE INTERIOR, 1849 C Street NW, | ) |
| Washington, DC 20240; DEB | ) |
| HAALAND, in her official capacity as | ) |
| the Secretary of the Interior, 1849 C | ) |
| Street NW, Washington, DC 20240; | ) |
| BUREAU OF OCEAN ENERGY | ) |
| MANAGEMENT, 1849 C Street NW, | ) |
| Washington, DC 20240; LIZ KLEIN, | ) |
| in her official capacity as the Director of | ) |
| the Bureau of Ocean Energy | ) |
| Management, 1849 C Street NW, | ) |
| Washington, DC 20240; NATIONAL | ) |
| MARINE FISHERIES SERVICE, | ) |
| 1315 East-West Highway Silver Spring, | ) |
| MD 20910; JANET COIT in her | ) |
| official capacity as the Administrator of | ) |
| the National Marine Fisheries Service | ) |
| 1315 East-West Highway Silver Spring, | ) |

MD 20910,                                    )
                                             )
                    Defendants.              )
_____ )

## COMPLAINT TO REVERSE AND SET ASIDE FINAL AGENCY ACTION

To implement a massive new program to generate electrical energy by constructing thousands of turbine towers offshore on the Atlantic Outer Continental Shelf and laying hundreds of miles of high-tension electrical cables undersea, the United States has shortcut the statutory and regulatory requirements that were enacted to protect our nation's environmental and natural resources, its industries, and its people.

On July 3, 2023, the United States Bureau of Ocean Energy Management ("BOEM") approved the Construction and Operations Plan for the Ocean Wind 1 Project, a 161,000-acre wind farm to be constructed by Ørsted North America offshore of the County of Cape May, by issuing a Record of Decision.[1] This final agency approval, together with BOEM's approval of a Final Environmental Impact Statement for the Project[2] and a collection of various other permits from other federal agencies, provides Ørsted, the company that will construct the Ocean Wind 1 Project, authorization to begin the necessary surveying and testing preparatory to construction. These approvals by BOEM and other federal agencies are final agency actions under the Administrative Procedure Act.[3]

---

[1] Bureau of Ocean Energy Management and National Marine Fisheries Service, *Record of Decision for Ocean Wind 1 Offshore Wind Farm Construction and Operations Plan* at 2 (July 3, 2023) (Record of Decision), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Ocean-Wind-1-ROD_0.pdf.
[2] Bureau of Ocean Energy Management, *Ocean Wind 1 Offshore Wind Farm Final Environmental Impact Statement* (May 26, 2023) (Final Environmental Impact Statement), https://www.boem.gov/renewable-energy/state-activities/ocean-wind-1-final-environmental-impact-statement-feis-commercial.
[3] 5 U.S.C. § 702.

In authorizing this Project, Defendants failed to comply with numerous statutes and their implementing regulations: Administrative Procedure Act,[4] National Environmental Policy Act,[5] Endangered Species Act,[6] Marine Mammal Protection Act,[7] Migratory Bird Treaty Act,[8] Coastal Zone Management Act,[9] National Historic Preservation Act,[10] Outer Continental Shelf Lands Act,[11] Clean Water Act,[12] and the Rivers and Harbors Act of 1899.[13]

In this suit, Plaintiffs, the County of Cape May, New Jersey, the County of Cape May Chamber of Commerce, Clean Ocean Action, the Garden State Seafood Association, the Greater Wildwood Hotel & Motel Association, LaMonica Fine Foods, Lund's Fisheries, and Surfside Seafood Products, ask this Court to invalidate those putative approvals of the Ocean Wind 1 Project until and unless the federal government complies with the relevant statutes and regulations. Plaintiffs' interests, all of which are dependent upon the natural state of the ocean, will be irreparably harmed if the challenged actions are not reversed as the law requires.

**Parties**

1.      Plaintiff, County of Cape May, is a subdivision of the State of New Jersey. Surrounded by the waters of the Atlantic Ocean to the east and Delaware Bay to the west, the County's economy and culture are heavily dependent on tourism and commercial fishing. The County is home to 95,000 year-round and 820,000 seasonal residents and welcomes millions of

---

[4] 5 U.S.C. §§ 701-706.
[5] 42 U.S.C. §§ 4321-4370h.
[6] 16 U.S.C. §§ 1540(g)(1)(A), (B).
[7] 16 U.S.C. § 1371.
[8] 16 U.S.C. § 703.
[9] 16 U.S.C § 1451.
[10] 54 U.S.C. §§ 300101-307101.
[11] 43 U.S.C. § 1349(a)(2)(A).
[12] 33 U.S.C. § 1365(b).
[13] 33 U.S.C. § 401.

visitors each year. With more than thirty miles of beaches, in 2022 the County of Cape May generated $7.4 billion in tourism. Commercial fishing contributed another $270 million to the County's economy in 2019. Tourism in the County of Cape May annually generates $615 million in state and local taxes and another $16 million in occupancy taxes.

2.      Plaintiff, County of Cape May Chamber of Commerce, is a New Jersey nonprofit corporation comprised of County of Cape May businesses that work together to support the interests of its members and advocate on the member businesses' behalf. The County of Cape May Chamber of Commerce's mission is to stimulate the growth and prosperity of members and communities in the County of Cape May through advocacy, service, education, collaboration, and leadership, and its overall vision is to have unified economic prosperity through thriving businesses and communities in the County of Cape May. Around 800 of the County of Cape May businesses are members of the Chamber. The member businesses represent all industries in the County of Cape May, including attractions and activities; automotive; camping, resort, fishing, watersports, and sightseeing; golfing; lodging; real estate, restaurants, food, and beverages; retailers and shopping; and transportation industries. The Chamber routinely monitors legislative and business issues that impact member businesses and advocates on behalf of the business community in the County of Cape May. The Chamber actively participated in the public meetings for the Ocean Wind 1 Project, submitting comments and making comments at the public meetings urging BOEM to be proactive in considering how the Project will impact commercial and recreational fishing and to adopt a well-rounded mitigation and compensation program for the industries that the Project will impact.[14]

---

[14] Emily Parsons, Representative of County of Cape May Chamber of Commerce During the July 26, 2022 Public Meeting, https://www.regulations.gov/comment/BOEM-2022-0021-1286.

3.      Plaintiff, Clean Ocean Action, Inc., is a New Jersey nonprofit corporation and 501(c)(3) organization headquartered in Long Branch, New Jersey. Clean Ocean Action is a regional, broad-based coalition of conservation, environmental, fishing, boating, diving, student, surfing, women's, business, civic, and community groups with the mission of improving the water quality of the marine waters off the coast of New Jersey and New York. Ocean Wind 1 and thirteen additional offshore wind projects are planned to soon occupy over 1,000,000 acres of the waters off of New Jersey and New York. Clean Ocean Action researches pollution issues affecting the marine environment, educates the public, and launches grassroots campaigns to advocate for the elimination of ocean pollution sources. Clean Ocean Action has held many successful campaigns, including improving programs and laws to protect public health at beaches; reducing plastics, fossil fuel emissions, and pollution from waterways; protecting the region from offshore oil and gas drilling; and blocking several largescale liquified natural gas ports. Clean Ocean Action has worked to ensure that the federal offshore wind projects in the waters off of New Jersey and New York follow the requirements of the federal review process and federal laws so that the ocean environment, marine life, and human interests are protected. Clean Ocean Action actively participated in the public comment and review process for the Ocean Wind 1 Project, including by providing comprehensive comments on the Draft Environmental Impact Statement, the Incidental Harassment Authorizations, and Federal Consistency Certification for the Project. Clean Ocean Action's primary concerns over the Project and its construction stem from the lack of fair presentation and assessment of alternatives; the dearth of baseline studies; the failure to require a responsible pilot project; the significant adverse impacts to benthic resources, marine mammals, finfish, invertebrates, essential fish habitats, water quality, birds, coastal habitats and fauna, cultural resources,

navigation and vessel traffic, sea turtles, and wetlands; the incorporation of inaccurate and incomplete analysis on the impacts to the North Atlantic right whale; the failure to adequately consider the cumulative impacts of the numerous offshore wind projects planned for the waters off New Jersey and New York and North Atlantic upon the highly endangered species; and the unfounded determination that the requested take of sixty-six North Atlantic right whales will have negligible consequences.

4.     Plaintiff, Garden State Seafood Association, is a New Jersey Association with more than 1,200 members, consisting of fishing vessels, commercial fishermen, shore-based seafood processors, commercial dock facilities, seafood markets, restaurants, and other New Jersey-based commercial fishing industry businesses. The Association is dedicated to the sustainable harvest of New Jersey's inshore and offshore waters and promotes the interests of the commercial fishing industry and seafood consumers in New Jersey. The Association collectively harvests more than $125 million worth of seafood products annually and supports 2,000 jobs in New Jersey. [15] The Association, which is a member of the Responsible Offshore Development Alliance, has advocated for BOEM to develop mitigation requirements for offshore wind projects so that BOEM can meet the mitigation hierarchy outlined in the National Environmental Policy Act and hold developers accountable for the unmitigable harm these offshore wind projects have to coastal communities, fishing interests, and the environment.[16] The Association actively participated in the public comment and review process for Ocean Wind

---

[15] Garden State Seafood Association Comment to Bureau of Ocean Energy Management, https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Renewable_Energy_Program/State_Activities/GardenStateSeafoodAssociation.pdf.

[16] Responsible Offshore Development Alliance, *Press Release on BOEM's Mitigation Measures* (January 11, 2022), https://rodafisheries.org/us-seafood-organizations-recommend-steps-to-reduce-impacts/.

1[17] and on BOEM's incomplete and inadequate mitigation plans to reduce the adverse consequences of New Jersey's offshore wind projects.[18] The Association's chief concerns about the Ocean Wind 1 Project stem from BOEM's failure to consider the adverse environmental impacts to the area before selecting the lease sites and the true cumulative impacts of the Project; failure to adequately evaluate and expand upon the adverse impacts to navigation and the fishing industry; failure to include transit lanes and to space the turbines a minimum of two nautical miles apart; and failure to provide transparent information on power generation, pricing, and economic impacts.[19]

5.      Plaintiff, the Greater Wildwood Hotel and Motel Association, represents 236 member motels, hotels, and other related tourism business partners in the Wildwoods, New Jersey. The Wildwoods is a five-mile barrier island comprised of North Wildwood, West Wildwood, Wildwood, and Wildwood Crest. The Association is the second largest association of hotels and motels in the State of New Jersey. The Association's mission is to promote the hospitality industry in the Wildwoods and support member businesses by providing services, advocacy, and exclusive membership benefits. The Association's activities include: cooperating with other organizations to promote the Wildwoods as a premier family destination; promoting events to attract visitors to the Wildwoods; providing industry standards and trends to members; addressing industry concerns and issues; operating the Wildwoods Welcome Center to assist guests with places to stay and things to do; providing information to visitors and prospective

---

[17] *See* Garden State Seafood Association Comments to the Bureau of Ocean Energy Management (August 23, 2022), https://www.regulations.gov/comment/BOEM-2022-0021-1234.
[18] *See* Garden State Seafood Association Comments on Third Solicitation for Offshore Wind Renewable Energy Certificates, https://www.regulations.gov/comment/BOEM-2022-0021-1234.
[19] *See* Garden State Seafood Association Comments to the Bureau of Ocean Energy Management (August 23, 2022), https://publicaccess.bpu.state.nj.us/CaseSummary.aspx?case_id=2111375.

visitors by publishing informative and promotional information; advocating and representing the hotel and motel industry politically, economically, and ecologically; and connecting member businesses with industry and hospitality vendors to provide the best services for members and their guests. Because tourism is a fragile industry that can change quickly based on weather, beach erosion, and labor shortages, the Association is incredibly concerned with what the wind turbines from the pending Ocean Wind 1 Project will do to the tourism industry in the Wildwoods. At the 2023 County of Cape May Tourism Conference, attended by Association members, survey results concerning visitors' reactions to the Ocean Wind 1 Project were released, confirming the Association's fear of a decrease in visitors and tourism. The Survey found the following: 59% of individuals polled did not know that the Project consisted of 98 turbines that are approximately 1,000 feet tall; 67% of individuals polled responded that they were not in favor of the Project; 84% of individuals polled were concerned about the impact the Project will have on mammals and other sea life; and 27% of individuals polled indicated that the turbines would affect vacation plans to the County of Cape May.

6.      Plaintiff, LaMonica Fine Foods, is a New Jersey-based limited liability company that processes and packs high-quality seafood products for retail and restaurants. Founded in 1923, LaMonica Fine Foods has a rich history. LaMonica primarily processes clams caught off the coast of New Jersey and the Atlantic Ocean and has one of the largest hand-shucking plants on the East Coast, which is located in Cumberland County, New Jersey. LaMonica is vertically integrated from boat to customer, meaning it can control and ensure the quality of the product from harvest through processing, packing, and delivery. LaMonica actively participated in the public comment process for Ocean Wind 1, attending meetings and advocating for BOEM and Ørsted to place the turbines two nautical miles apart so that clamming vessels could continue

operating safely in the lease area. LaMonica also submitted several comments on the Draft Environmental Impact Statement regarding the inadequate spacing of the turbines and BOEM's failure to weigh the impacts on benthic shellfish adequately, to consider the amount of lost revenue to clammers, and to consider compensation funds for lost clamming grounds and future income.[20]

7.      Plaintiff, Lund's Fisheries, is a New Jersey-based corporation. Lund's is a world-renowned seafood company that has been trusted and relied on for almost 70 years. Lund's has locations on both the East and West Coasts of the United States and is a leading producer of finfish and scallops and the only domestic producer of all three United States' squid species. Based in the County of Cape May, Lund's Fisheries employs 200 individuals, manages 19 vessels, and operates one of the largest seafood processing facilities on the eastern seaboard, which is located in the County of Cape May. Lund's Fisheries' Cape May facility can process up to 450 metric tons of product daily. Lund's Fisheries actively participated in the public notice period and the environmental review process for Ocean Wind 1 and expressed its concerns regarding the Project, which include the failure to use all available data to understand the patterns of commercial fishing vessels; the failure to include analysis of potential fishing vessel access, safety, and navigation risk using Closest Point of Approach methodology; the failure to incorporate the New York Bight Transit Lanes Surveys and Outreach Summaries into the Project and the site plans; the lack of commitment to address impacts to marine navigational radar from wind turbines; and the lack of regional transit lanes throughout the lease area.[21]

---

[20] *See* Final Environmental Impact Statement *supra* note 2 at O.6.8-16-17; O.9-3.
[21] Lund's Fisheries Comment to the United States Coast Guard (August 25, 2021); *see also* Comment Submitted by Lunds' Fisheries, USCG-2020-0172-0058 (Oct. 25, 2021), https://www.regulations.gov/comment/USCG-2020-0172-0058.

8.      Plaintiff, Surfside Seafood Products Foods, LLC, is a New Jersey limited liability company. Surfside is a leader in harvesting and processing sustainable clams and supplies Ocean Quahog and Atlantic Surf clams and clam juice ingredients to the food service industry and retail markets. Founded in the 1930s, Surfside has been at the forefront of innovation in the clamming industry and pioneered the hand shucking and canning process for locally sourced Surf Clam. Surfside is vertically integrated, operating seven vessels and processing all its products in-house. Surfside actively participated in the public comment process for Ocean Wind 1 and submitted comments on the Draft Environmental Impact Statement regarding the inadequate alternatives, the failure of BOEM to include transit lanes and design the Project so that clammers could operate, and the insufficient mitigation measures proposed by BOEM.[22]

9.      Defendant, the United States of America, is a republic whose powers are defined and limited by the Constitution and statutes of the United States. The United States acts through its various departments, agencies, instrumentalities, and officials.

10.      Defendant, the United States Department of the Interior, is an agency of the federal government that plays a central role in how the United States stewards its public lands and waters, increases environmental protections, and pursues environmental justice. The agency's mission is to protect and manage the Nation's natural resources and provide scientific and other information about those resources. The Department of the Interior prioritizes investing in climate research and environmental innovation to incentivize the rapid deployment of clean energy solutions while reviewing existing programs to restore balance on America's public lands and waters to benefit current and future generations. The Department of the Interior is

---

[22] Surfside Foods, LLC Comments to the Bureau of Ocean Energy Management (August 23, 2022), https://www.regulations.gov/comment/BOEM-2022-0021-1222.

authorized to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities that produce or support the production of energy from oil, gas, and other sources.[23]

11.     Defendant, Deb Haaland, is the Secretary of the United States Department of the Interior and is responsible for overseeing the nation's Outer Continental Shelf lands and oceans, including those selected for offshore wind projects. Secretary Haaland oversees BOEM and is ultimately responsible for the decisions taken by BOEM. Secretary Haaland is sued in her official capacity as Secretary of the Interior.

12.     Defendant, Bureau of Ocean Energy Management ("BOEM"), is a federal agency within the Department of Interior established in 2010 to oversee the energy development of the Outer Continental Shelf. BOEM's stated mission "is to manage the development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[24] BOEM evaluates the resources of the Outer Continental Shelf and leases portions of it. BOEM also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases.

13.     Defendant, Liz Klein, is the Director of BOEM. She issued the final agency decision challenged here—the approval of Ocean Wind 1's Construction and Operations Plan. Director Klein is sued in her official capacity as Director of the Bureau of Ocean Energy Management.

14.     Defendant, the National Marine Fisheries Service, is a federal agency founded in 1871 and placed within the National Oceanic and Atmospheric Administration (NOAA) in 1970. The Service oversees national marine resources, conserves fish species, and manages fisheries,

---

[23] 16 U.S.C. § 1337(p)(1)(C).
[24] U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us https://www.boem.gov-about-boem (last visited Aug. 16, 2023).

promoting sustainability and preventing overfishing, species decline, and habitat destruction. The Service also implements and enforces the Endangered Species Act with regard to marine organisms and authorizes the incidental take and harassment of listed species, and also administers the Marine Mammal Protection Act and authorizes the incidental harassment of marine mammals.

15.     Defendant, Janet Coit, is the Administrator of the National Marine Fisheries Service. She is ultimately responsible for the Biological Opinion, Incidental Take Statement, Letter of Authorization, and Incidental Harassment Authorization challenged here. Administrator Coit is sued in her official capacity as Director of the Service.

**Jurisdiction and Venue**

16.     The United States has waived its sovereign immunity, and this Court has jurisdiction of this case under the Administrative Procedure Act,[25] National Environmental Policy Act,[26] Endangered Species Act,[27] Marine Mammal Protection Act,[28] Migratory Bird Treaty Act,[29] Coastal Zone Management Act,[30] National Historic Preservation Act,[31] Outer Continental Shelf Lands Act,[32] Clean Water Act,[33] and the Rivers and Harbors Act of 1899.[34]

17.     The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and 5 U.S.C. § 702 (Administrative Procedure Act or "APA").

---

[25] 5 U.S.C. §§ 701-706.
[26] 42 U.S.C. §§ 4321-4370h.
[27] 16 U.S.C. §§ 1540(g)(1)(A), (B).
[28] 16 U.S.C. § 1371.
[29] 16 U.S.C. § 703.
[30] 16 U.S.C. § 1451.
[31] 54 U.S.C. §§ 300101-307101.
[32] 43 U.S.C. § 1349(a)(2)(A).
[33] 33 U.S.C. § 1365(b).
[34] 33 U.S.C. § 401.

18.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

19.     An actual, justiciable case or controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because the Defendants' approval of the Ocean Wind 1 Construction and Operations Plan, the issuance of the Incidental Harassment Authorization and incidental take permits, approval of the Final Environmental Impact Statement for the Project, and grant of an easement are final agency actions under the Administrative Procedure Act.

20.     Plaintiffs have exhausted all administrative remedies, the agency actions challenged in this suit are final and ripe for review, and Plaintiffs have standing because they are injured in fact by the federal Defendants' actions or omissions, and this court has the power to redress those injuries.

**Statement of Facts**

21.     The County of Cape May has a rich 300-year history and is home to a thriving tourism economy and commercial industry. Every year, millions of tourists come to the County and spend billions of dollars to sunbathe on its beaches, observe whales and dolphins, enjoy the views of the ocean, stay in historic properties, enjoy the historic boardwalks and shops, and experience the County's festivals and celebrations. The County of Cape May contains 14 beaches, 32 marinas and boatyards, six yacht clubs, and two boardwalks. Residents and visitors alike swim, surf, sail, boat, fish, dive, kayak, and whale watch in the waters surrounding the county. The County of Cape May's economy, culture, and lifestyle are centered on the waters of the Atlantic Ocean, and tourism is the County of Cape May's largest economic driver. Tourism

supports 39,430 jobs in the County of Cape May, and more than 63% of the County's total jobs are linked to the tourism industry.

22.     Rentals dominate the lodging sector, with $2.4 billion generated in rental income in 2021. The summer resident population grows eight-fold compared to the winter resident population, with an annual visitor base of over 10 million. Nearly 1 in every 5 tourism dollars spent in New Jersey is spent in the County of Cape May, with tourism expenditures outpacing all other counties in the state in the food and beverage, retail, and recreation sectors.[35]

23.     Because most of the County of Cape May is located on the Cape May peninsula and is surrounded by the Delaware Bay and the Atlantic Ocean, it has attracted sizeable recreational fishing and boating and commercial fishing industries. Thousands of boats and ships utilize the passage to and from the Cape May Inlet, Cape May Harbor, and the Port of Cape May. Cape May's commercial fishing industry is one of the County's oldest industries and continues to be the County's largest employer and revenue-producing sector. The combined port of Cape May/Wildwood is the largest commercial fishing port in New Jersey and one of the largest on the East Coast. Some of the largest seafood processing facilities on the East Coast are located in the County of Cape May. In 2019, the fishing industry in Cape May brought in 94.5 million pounds of seafood and $270 million in local income.[36] Commercial fisheries in the

---

[35] Cape May County, *Post COVID Tourism Recovery Report* (May 25, 2022), https://capemaycountynj.gov/DocumentCenter/View/10037/2022-Cape-May-County-Tourism-BookFinal#:~:text=Cape%20May%20County's%202020%20direct,spent%20in%20Cape%20May%20County./.

[36] Cape May County Chamber of Commerce, *Commercial Fishing Industry in Cape May County*, https://www.capemaycountychamber.com/commercialfishing/commercial-fishing-industry-in-cape-may-county/ (last visited Oct. 4, 2023).

County of Cape May harvest scallops, butterfish, summer flounder, scup, black sea bass, surf clams, ocean quahog, lobster, herring, and monkfish.[37]

24.     In 1761, Cape Island officially became the first seashore resort in America. Visitors from Philadelphia came by horse-drawn wagons, stagecoaches, sloops, and schooners—and later by train and steam-powered boats—to vacation by the sea in the County of Cape May. In 1976, the entire city of Cape May was designated a National Historic Landmark. The County of Cape May is home to three historic districts and multiple historic properties that are listed in or eligible for the National Register of Historic Places. Together, the three districts include more than 150 historic structures, including the George Allen House, Chalfonte Hotel, Congress Hotel, Ocean City Music Pier, the Flanders Hotel, and the Chateau Bleu Motel.

25.     The County of Cape May is world-famous for observing migrating birds. It is considered one of the top bird-watching areas in the Northeastern United States, especially the Cape May Bird Observatory at Cape May Point and Nature Conservancy's migratory bird refuge. The fields and woods of Cape May fill with a myriad of long-distance migrants like warblers, vireos, tanagers, grosbeaks, orioles, and buntings. Birdwatchers from across the country gather for the annual ritual daily hawk watch at the Cape May Point State Park, where a designated counter and cadre of naturalists tally the day's passage of falcons, hawks, and eagles from sunrise to sunset and provide insight to visitors, which can reach more than 1000 people on busy days.

---

[37] Cape May County, *Commercial Fishing*, https://capemaycountynj.gov/940/Commercial-Fishing (last visited Oct. 4, 2023).

26.     With an economy based almost entirely on tourism and commercial fishing, the County cannot sustain a drastic change in its workforce and culture, which will occur because of offshore wind projects. Small family businesses will face hardship and may be forced to close, which will eliminate services tourists rely on. Commercial fisheries will face increased safety hazards, lower yields, and will most likely be unable to fish productively in the Project area. With a loss in tourism, shops, historic properties, restaurants, rental properties, and home values will decline in value and demand, and the spirit, culture, and rich history of the Jersey Shore will be lost.

**Federal Offshore Wind Projects Slated for the Waters Off of New Jersey and New York**

27.     The County of Cape May abuts a portion of the Atlantic Ocean, whose water quality Plaintiffs seek to protect and improve. Hundreds of species of fish, birds, shellfish, and invertebrates depend on this area of ocean environment for shelter, food, breeding, and/or migration. The New York Bight also provides habitat to thirty-two species of whales and dolphins, one species of porpoise, five species of sea turtles, and four species of seals. Many threatened and endangered species, including the Atlantic and Shortnose Sturgeons, the Loggerhead, Kemp's Ridley, Leatherback, Hawksbill, and Green sea turtles; and the Blue, Fin, Sei, Sperm, and the near-extinct North Atlantic right whales, utilize the area off of New Jersey and New York either seasonally or during their life cycle. This part of the Atlantic Ocean can sustain such a vibrant ecosystem due to its unique marine geology and hydrological features, such as cooler waters, Hudson Canyon, and nationally significant estuaries.

28.     The Atlantic Ocean between New Jersey and New York also supports robust commercial and recreational fishing industries that provide sustainable seafood for millions of

people each year, as well as whale-watching experiences, birding, and other ocean-dependent recreational activities for thousands of nature enthusiasts.

29.     Offshore wind farms like Ocean Wind 1 inarguably damage and eliminate vast areas of natural marine habitat and available fishing grounds, generate underwater and above water noise, discharge heated contaminated water, emit electromagnetic fields and heat, result in chemical spills, cause water pollution and turbidity, create micro-climates, increase vessel traffic, create navigational hazards which may result in collisions including with chemical or oil tankers, emit air pollutants, generate construction debris, and adversely impact marine life migration. Accordingly, such projects are likely to profoundly impact marine life within the lease area and potentially impact the broader area between New Jersey and New York, including the increased risk of vessel strikes, disruption of feeding, breeding, and migratory patterns, and alterations of the food web. Ocean Wind 1 is one of 14 projects planned to occupy over 1 million acres of the waters off of New Jersey and New York. Thus, the significant impacts of Ocean Wind 1 are just the tip of the iceberg when it comes to the totality of negative impacts threatened by offshore wind projects.

**The Federal Offshore Wind Program**

30.     In 1953, Congress enacted the Outer Continental Shelf Lands Act (OCSLA), authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases through a competitive bid process managed by the Department of Interior.[38] Originally, the Act "establish[d] a procedural framework under which Interior may lease areas of the [Outer Continental Shelf] for purposes

---

[38] 43 U.S.C. §§ 1331-1356.

of exploring and developing the oil and gas deposits of the [Outer Continental Shelf ]'s submerged lands."[39]

31.   In 2005, Congress amended OCSLA, placing regulatory authority of renewable energy projects in the Minerals Management Service, an agency within the Department of Interior, and authorizing the Minerals Management Service to grant leases for offshore renewable energy projects.[40]

32.   In the 2005 amendment, Congress declared the policy underlying the Act:

> It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the national interest in the effective management of the marine, coastal, and human environments. . . .[41]

33.   In 2009, the Minerals Management Service formed a federal/New Jersey Renewable Energy Task Force for coordination among federal agencies, the New Jersey State government, and local governments for offshore wind projects and leasing.

34.   In 2011, the Minerals Management Service revised its offshore wind energy leasing regulations and implemented the Government's new "Smart from the Start" policy. This policy was designed to "speed offshore wind energy development off the Atlantic Coast"[42] in

---

[39] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).
[40] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).
[41] 43 U.S.C. § 1332.
[42] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020),

the wake of the beleaguered Cape Wind Project. These revisions streamlined the review and approval of leases, allowing BOEM's predecessor to bypass the multiple periods of public comment that existed before 2011. Before the revisions to the regulations, the issuance of a lease and approval of development had four phases: (1) planning and analysis, (2) lease issuance, (3) site Assessment Plan approval, and (4) Construction and Operation Plan approval. The 2011 revisions merged the first three steps into one, leaving only one opportunity for public comment and removing any pre-bid opportunities for public comment on lease locations, on-site evaluations of environmental impacts, or reasonable uses before lease issuance. These new regulations allowed for most of the details of these projects—lease location, size, distance from land—to be determined before the release of the project information and before any type of notice and comment, depriving citizens of the opportunity to participate in the planning of projects that have significant impacts on their lives and livelihoods, the economy, and the ecology of the Atlantic coast of the United States.

35.     On April 20, 2011, the Minerals Management Service published a "Call for Information and Nominations for Commercial Leasing for Wind Power on the Outer Continental Shelf Offshore New Jersey."[43] During the comment period, the Minerals Management Service received eleven indications of interest from companies interested in participating in an offshore wind project.[44]

36.     On October 1, 2011, the Department of Interior created the Bureau of Ocean Energy Management ("BOEM") to take the place of the Minerals Management Service and

---

https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

[43] 76 Fed. Reg. 22130 (April 20, 2011).

[44] *See* Record of Decision *supra* note 1 at 2.

transferred all regulatory authority of the Minerals Management Service to BOEM. BOEM

became "responsible for managing development of the nation's offshore resources in an

environmentally and economically responsible way."[45] BOEM also became responsible for

leasing, plan administration, environmental studies, NEPA analysis, resource evaluation,

economic analysis, and the renewable energy program.[46]

     37.     In March 2021, the Government announced its goal of deploying 30 gigawatts of

offshore wind energy projects by 2030 and announced it was taking "coordinated steps to

support rapid offshore wind deployment."[47] This announcement contained plans for a New

Wind Energy Area in the New York Bight area (between Long Island and New Jersey) and noted

that the administration was "advancing critical permitting milestones for the Ocean Wind

Offshore Wind program."[48] Noticeably absent from this announcement was any reference to

ensuring the protection of the ocean, its resources, and the environmental damage these offshore

wind projects create.

     38.     BOEM has demonstrated a clear bias towards offshore wind development,

notwithstanding existing laws and regulations requiring due process and careful consideration of

its harmful impacts. For example, in 2022, BOEM and NOAA entered into a memorandum of

agreement to "support[] the goal…to responsibly deploy 30 gigawatts of energy production on

---

[45] Bureau of Ocean Energy Management, *Reorganization of the Former MMS*, https://www.boem.gov/about-boem/reorganization/reorganization-former-mms (last visited Sept. 18, 2023).
[46] *Id.*
[47] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (March 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.
[48] *Id.*

the Outer Continental Shelf by 2023…."[49] The memorandum boldly proclaims the intent of

BOEM and NOAA to "proactively refine administrative procedures" without mention of the

public rulemaking process required by the Administrative Procedures Act.[50] The memorandum

follows a series of similar informal agreements by which BOEM is attempting to pave the way

for offshore wind development without engaging in formal rulemaking or other public

processes.[51]

**The Ocean Wind 1 Project**

39.     In February 2012, BOEM published a Notice of Availability of a final

Environmental Assessment and Finding of No Significant Impact for commercial wind lease

issuance and site assessment activities on the Outer Continental Shelf offshore of New Jersey,

Delaware, Maryland, and Virginia, including the area now covered by the Ocean Wind 1 lease.[52]

40.     Two years later, in July 2014, BOEM published a Proposed Sale Notice

requesting public comment on the proposed sale of two leases located offshore of New Jersey.[53]

On September 23, 2015, BOEM announced a Final Sale Notice of the two lease areas. Lease

OCS-A 0498 was purchased by RES America Developments Inc. and OCS-A 0499 was

purchased by U.S. Wind, Inc.[54] The lease purchased by RES America Developments Inc. was

acquired by Ocean Wind LLC in 2016.

---

[49] Memorandum of Understanding Between NOAA, NMFS, BOEM and RODA (March 25, 2019), https://www.boem.gov/sites/default/files/documents//NOAA-BOEM-MOU.pdf).
[50] *Id.* at 1.
[51]*See* Memorandum of Understanding and Memorandum of Agreement, (last visited October 3, 2023), https://www.boem.gov/MOUs-MOAs.
[52] *See* 77 Fed. Reg. 5560 (Feb. 3, 2012); *see also id.*
[53] *See* 77 Fed. Reg. 42361 (July 21, 2014).
[54] *See* Record of Decision *supra* note 1 at 2.

41.     Ocean Wind LLC's lease, OCS-A 0498 was divided into two projects, Ocean Wind 1 and Ocean Wind 2. RES America Developments Inc.'s lease was also split into two projects, Atlantic Shores North and Atlantic Shores South. These four projects span from Atlantic City to the tip of the County of Cape May and will include hundreds of wind turbines. Atlantic Shores South, which will sit less than one nautical mile away from Ocean Wind 1, is expected to have 200 turbines across 102,124 acres.

42.     On September 15, 2017, Ocean Wind LLC, an Ørsted Wind Power North America LLC affiliate, submitted a Site Assessment Plan for its lease and revised it three times through 2017 and 2018. BOEM approved the Site Assessment Plan on May 17, 2018.

43.     In August 2019, Ocean Wind LLC submitted a Construction and Operations Plan to BOEM, which proposed the development of an offshore wind energy project for approximately 1,100 megawatts, with up to 98 wind turbines, in a 75,525-acre area of Lease Area OCS-A 0498. At its highest point, each of these turbines will measure 906 ft above the mean low water measurement and will require $0.9 \text{ km}^2$ of scour protection across the entire Project.

44.     Ocean Wind LLC has updated its Construction and Operations Plan seven times since August 2019: March 13, 2020, September 24, 2020, March 24, 2021, December 10, 2021, May 27, 2022, and April 24, 2023.

45.     On March 30, 2021, BOEM published a Notice of Intent to prepare an Environmental Impact Statement for the proposed Project.

46.     On May 10, 2021, the National Marine Fisheries Service awarded an Incidental Harassment Authorization to Ocean Wind, LLC for Marine Site Characterization Surveys off of New Jersey.

47.     On October 1, 2021, Ocean Wind LLC requested an incidental take permit under the Marine Mammal Protection Act from the National Marine Fisheries Service. Ocean Wind LLC submitted a complete application for a five-year incidental take authorization for marine mammals in February 2022. The Service published the application for review and comment on March 7, 2022.[55] On October 26, 2022, the Service published an Incidental Take Request associated with Ocean Wind LLC's application.

48.     On June 24, 2022, BOEM published the Draft Environmental Impact Statement, which analyzed the impacts of a No Action Alternative, the Proposed Action, and four alternatives. BOEM extended the public comment period by two weeks and received more than 1,400 comments from local governments, concerned individuals, and organizations.

49.     On July 26, 2022, BOEM held its third and final virtual hearing on the Draft Environmental Impact Statement. This followed virtual hearings on July 14 and July 20, 2022. Many participants expressed concerns that the subject Project would cause significant environmental impacts.

50.     On April 3, 2023, the National Marine Fisheries Service issued a Biological Opinion for the Project.

51.     On May 12, 2023, the U.S. Fish and Wildlife Service issued a letter of concurrence with the National Marine Fisheries Service's decision and issued a Biological Opinion for ESA-listed species within their jurisdiction.

52.     On May 26, 2023, BOEM published the Final Environmental Impact Statement and published its Record of Decision, approving Ocean Wind 1's Construction and Operations

---

[55] 87 Fed. Reg. 12666.

Plan on July 3, 2023.[56] While BOEM added additional analysis on the impacts on historic properties, much of BOEM's analysis from the Draft Environmental Impact Statement remained unchanged in the Final Environmental Impact Statement.

**First Cause of Action**

**Violation of the Administrative Procedure Act**

53.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

54.     The Administrative Procedure Act provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[57] The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[58]

55.     An agency's action is arbitrary and capricious within the meaning of the Administrative Procedure Act if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[59]

56.     BOEM's July 3, 2023 approval of the Ocean Wind 1 Construction and Operations Plan is arbitrary, capricious, and not in accordance with law for all the reasons stated in this

---

[56] *See* Record of Decision *supra* note 1 at 3.
[57] 5 U.S.C. §702.
[58] 5 U.S.C. § 706.
[59] *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).

Complaint, including violations of the National Environmental Policy Act,[60] Endangered Species Act,[61] Marine Mammal Protection Act,[62] Migratory Bird Treaty Act,[63] Coastal Zone Management Act,[64] Historic Preservation Act,[65] Outer Continental Shelf Lands Act,[66] Clean Water Act,[67] and Rivers and Harbors Act of 1899.[68]

57.     The National Marine Fisheries Service's decision to publish its final Incidental Take Regulations and issue a Letter of Authorization for the Ocean Wind 1 Project on July 3, 2023,[69] and its subsequent publication of the Letter of Authorization and Incidental Take Regulation on September 13, 2023,[70] were arbitrary, capricious, and not in accordance with the law, as more fully described in Plaintiffs' Third and Fourth Causes of Action.

58.     In addition, BOEM's and the National Marine Fisheries Service's decisions and approvals of the Ocean Wind 1 Project are arbitrary and capricious because the United States Corps of Engineers has not yet determined whether, or on what terms, it will issue several critical permits for the Project: a permit to discharge dredge or fill material into waters of the United States, as required by Section 404 of the Clean Water Act;[71] a permit for the impairment or destruction of a federal project under the Rivers and Harbors Act;[72] and a permit for

---

[60] 42 U.S.C. §§ 4321-4370h.
[61] 16 U.S.C. §§ 1531-1544.
[62] 16 U.S.C. §§ 1361-1423(h).
[63] 16 U.S.C. §§ 703-712.
[64] 16 U.S.C. §§ 1451-1464.
[65] 54 U.S.C. § 306108.
[66] Plaintiffs have sent a 60-day notice of their intent to sue under OCSLA and will amend this Complaint to add the OCSLA cause of action when the 60 days expires.
[67] 33 U.S.C. § 1365(b).
[68] 33 U.S.C. § 401.
[69] *See generally* Record of Decision *supra* note 1.
[70] 88 Fed. Reg. 62898 (Sept. 13, 2023).
[71] *See* 33 U.S.C. § 1344.
[72] *See* 33 U.S.C. § 408.

placement of structures in navigable water under Section 10 of the Rivers and Harbors Act of 1899.[73] By approving the Project without these permits, without considering whether or how the Ocean Wind 1 Project will be allowed to discharge pollutants into the ocean, utilize marine structures belonging to the United States, dredge the seabed and cover it with concrete and boulders, and obstruct navigation with turbines, Defendants have failed to analyze important aspects of this Project before approving it.

59.     These actions of BOEM and the National Marine Fisheries Service have deprived Plaintiffs of the procedural protections set forth in the Administrative Procedures Act and will irreparably harm the interests of Plaintiffs supported by the current conditions of the ocean environment.

60.     This Court should therefore reverse and set aside these approvals and permits and remand this matter to the agencies for further consideration in accordance with the relevant statutes and the Administrative Procedure Act.

**Second Cause of Action**

**Violation of the National Environmental Policy Act
and the Administrative Procedure Act**

61.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows.

62.     The National Environmental Policy Act ("NEPA") requires "the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions" like the Ocean Wind 1 Project.[74]

---

[73] *See* 33 U.S.C. § 403.
[74] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).

63.     NEPA serves as our "basic national charter for the protection of the environment."[75] NEPA achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences" of their proposed actions.[76] NEPA's "hard look" requires federal agencies to analyze and consider "any adverse environmental effects which cannot be avoided."[77] To comply with NEPA, Agencies must consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment."[78]

64.     NEPA requires agencies to "identify and develop methods and procedures . . . which will ensure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations."[79] Specifically, NEPA requires federal agencies to prepare a "detailed statement [for all major agency actions] significantly affecting the quality of the human environment,"[80] known as an Environmental Impact Statement.

65.     The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[81] NEPA

> ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to

---

[75] 40 C.F.R. § 1500.1(a).

[76] *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989).

[77] 42 U.S.C. § 4332(C)(ii).

[78] *Id*.

[79] 42 U.S.C. § 4332(B).

[80] 42 U.S.C. § 4332(C).

[81] *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97 (1983); *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143 (1981).

the larger audience that may also play a role in both the decision-making process and the implementation of that decision.[82]

66.      The May 26, 2023 Final Environmental Impact Statement prepared by BOEM and NMFS was incomplete, inaccurate, and failed to comply with multiple requirements of NEPA. And because those agencies failed to comply with NEPA by failing to take a hard look at the environmental impacts of the Ocean Wind 1 Project, their July 3, 2023 final agency actions approving the Project's Construction and Operations Plan and Letter of Authorization were arbitrary, capricious, and not in accordance with law—and should therefore be set aside.

**Defendants Have Violated NEPA by Impermissibly Segmenting the Multiple Areas of the Offshore Wind Program and Ignoring the Cumulative Environmental Impacts of the Thousands of Turbines on Millions of Acres of Ocean That BOEM Expects to Approve in the Near Future**

67.      NEPA requires that an Environmental Impact Statement include within its scope "[c]umulative actions [that] when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"[83] and "[s]imilar actions [that] when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together."[84] This cumulative impact requirement ensures that agencies consider the collective effects of individually minor but related actions over time when analyzing the environmental impacts of a proposed government action.[85]

68.      NEPA is

in large measure, an attempt by Congress to instill in the environmental decision-making process a more comprehensive approach so that long-term and cumulative effects of small and unrelated decisions could be recognized, evaluated, and either

---

[82] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[83] 40 C.F.R. § 1508.25(a)(2).
[84] 40 C.F.R. § 1508.25(a)(3).
[85] 40 C.F.R. § 1508.7.

avoided, mitigated, or accepted as the price to be paid for the major federal action under consideration.[86]

69.    The Council on Environmental Quality defines cumulative effects as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[87]

70.    The United States has set a target of producing 30 Gigawatts (30,000 megawatts) of Offshore Wind by 2030:

> To position the domestic offshore wind industry to meet the 2030 target, DOI's Bureau of Ocean Energy Management . . . plans to advance new lease sales and complete review of at least 16 Construction and Operations Plans (COPs) by 2025, representing more than 19 GW of new clean energy for our nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050. . . ."[88]

Defendants acknowledged the interrelated and cumulative effects of their offshore wind program in 2007 when they produced a Programmatic Environmental Impact Statement for Alternative Energy Development and Production and Alternate Use of Facilities on the Outer Continental Shelf.[89] Defendants intended this Programmatic Environmental Impact Statement to provide a "baseline analysis that helps to satisfy the requirements of NEPA for offshore renewable energy

---

[86] *Nat. Res. Def. Council, Inc. v. Callaway,* 524 F.2d 79, 88 (2d Cir. 1975).

[87] 40 C.F.R. § 1508.7.

[88] Biden Administration, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (March 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

[89] Bureau of Ocean Energy Management, United States Department of the Interior, *Guide to the OCS Alternative Energy Final Programmatic Environmental Impact Statement,* https://www.boem.gov/ renewable-energy/guide-ocs-alternative-energy-final-programmatic-environmental-impact-statement-is.

leasing,"[90] because "many wind energy projects will have similar environmental impacts."[91] This Programmatic Environmental Impact Statement does not satisfy NEPA's cumulative impacts requirement today because Defendants have significantly altered and expanded their offshore wind program, rendering the Programmatic Environmental Impact Statement's analysis of cumulative environmental impacts inaccurate and outdated and requiring a supplemental or new Environmental Impact Statement analyzing the current program as it now exists.

71.     Ocean Wind 1 is one of four wind projects slated to be constructed off the coast of southern New Jersey. Three other projects are in the works. Atlantic Shores North's Construction and Operations Plan is still being reviewed by BOEM but is anticipated to consist of 160 wind turbines.[92] Atlantic Shores South, which will place its wind turbines one nautical mile away from Ocean Wind 1's turbines, is currently awaiting approval, and the public comment period for the Draft Environmental Impact Statement closed in July 2023.[93] Atlantic Shores South is anticipated to consist of 211 wind turbines.[94] And Ocean Wind 2, which will also be adjacent to Ocean Wind 1, is in the early stages of planning and is anticipated to consist of 113 wind turbines.[95] Once constructed, these four projects will run from off the coast of Atlantic City to the tip of the County of Cape May and will look as if they are one continuous project of more than 550 wind turbines.

72.     But Defendants' Final Environmental Impact Statement fails to take a hard look at the cumulative impacts of Ocean Wind 1 combined with the three adjacent offshore wind

---

[90] *Id.* at 7.
[91] *Id.*
[92] Final Environmental Impact Statement *supra* note 2 at F-6.
[93] Final Environmental Impact Statement *supra* note 2 at F-6.
[94] Final Environmental Impact Statement *supra* note 2 at F-6.
[95] Final Environmental Impact Statement *supra* note 2 at F-6.

projects that have been leased and are expected to be constructed nearby and the dozen or more additional offshore wind energy facilities that are expected to be built along the Atlantic coastline. BOEM thus fails to analyze the combined impacts of the thousands of proposed offshore wind turbines, covering millions of acres of pristine seabed and open ocean, on the human and natural environment.

73.     By segmenting their offshore wind program and analyzing the environmental impacts of the Ocean Wind 1 Project in isolation, Defendants unlawfully fail to analyze and consider the cumulative environmental impacts of the other multiple offshore wind projects that BOEM has approved or is considering for approval. Defendants' failure to analyze the cumulative environmental impacts of its offshore wind program, as NEPA requires, is arbitrary, capricious, and not in accordance with law—and should be invalidated and set aside.[96]

**Defendants Impermissibly Narrowed the Project Description, Unlawfully Limiting Their Analysis of Alternatives to the Proposed Ocean Wind 1 Project**

74.     NEPA's implementing regulations require that the agency "specify the underlying purpose and need for the proposed action."[97] This identification of the purpose and need for the Project then allows the agency to identify and analyze reasonable alternatives to the proposed project that may be less environmentally damaging. Under NEPA, government agencies are not permitted to limit their analysis of reasonable alternatives "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives," nor can they lawfully "craft a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party.[98]

---

[96] 5 U.S.C. § 706.
[97] 40 C.F.R. § 1502.13.
[98] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

75.    NEPA further requires that the Environmental Impact Statement provide a "detailed statement . . . on . . . alternatives to the proposed action . . . ."[99] and that the agency "[s]tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[100] The Environmental Impact Statement must include consideration of "[a]lternatives, which include the no-action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action)"[101] in an agency's environmental review of an action under consideration." In considering alternatives for mitigation, agencies must follow a stepwise approach:

a.    Avoid[] the impact altogether by not taking a certain action or parts of an action.
b.    Minimiz[e] impacts by limiting the degree or magnitude of the action and its implementation.
c.    Rectify[] the impact by repairing, rehabilitating, or restoring the affected environment.
d.    Reduc[e] or eliminate [e] the impact over time by preservation and maintenance operations during the life of the action.
e.    Compensat[e] for the impact by replacing or providing substitute resources or environments.[102]

76.    Contrary to NEPA's requirements, Defendants narrowly defined the purpose of the Ocean Wind 1 Project so as to ensure that Ocean Wind LLC could meet its "stated goal" to "construct and operate a commercial-scale offshore wind energy facility in the Lease Area intended to fulfill BPU's September 20, 2018, solicitation for 1,100 MW of offshore wind capacity."[103] Defendants violated NEPA by allowing Ocean Wind 1's existing private contract

---

[99] 42 U.S.C. § 4332(2)(C).
[100] *Id.* § 4332(2)(E).
[101] 40 C.F.R. § 1501.9(E)(2).
[102] 40 C.F.R § 1508.20.
[103] Record of Decision *supra* note 1 at 7.

with New Jersey to define the need for the Project, thereby impermissibly limiting the available reasonable alternatives to the Project—predetermining the outcome of their review and acting in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

77.     Defendants then limited all of the alternatives they would consider to those that would provide 1,100 MW wind energy facilities in the lease area, with the only significant differences being that the alternatives had fewer turbines, more space between project sites, different cable placement routes, or less space between turbines. In doing so, Defendants excluded any alternatives that proposed a different location, were smaller in scale, or had less environmental impact. In the Environmental Impact Statement, Defendants admitted that they rejected all of the alternatives because they either compressed turbine layout, required a redesign of the inter-array cables, or relocated turbines—all of which required approval from Ocean Wind 1 and New Jersey and would delay the Project by up to two years.[104]

78.     In approving the May 26, 2023 Environmental Impact Statement and the July 3, 2023 Construction and Operations Plan for the Ocean Wind 1 Project, Defendants failed to study, develop, or describe reasonable alternatives to the proposed Project outside and inside of the Project area that would avoid, minimize, reduce, and compensate for the environmental impacts of the Project. Specifically, Defendants failed to consider:

---

[104] *See* Final Environmental Impact Statement *supra* note 2 at 2-22 ("[A]lternatives that relocate [turbine] positions or compress the turbine layout and require redesign of the interarray cables may require additional site investigation. Collection and processing additional survey data could lead to a Project delay of up to 2 years.").

- Options to meet the purpose and need of the action outside of the lease area through the onshore production of electrical energy, both fossil and nonfossil, including coal, gas, nuclear, solar, and onshore wind—among others, or methods to increase energy efficiency and reduce waste;

- Other offshore locations for the wind energy Project—a set of alternatives foreclosed by Defendants' failure to prepare the Environmental Impact Statement until after leasing the area to the Project's sponsor;

- Project designs and specifications that did not necessarily satisfy the terms of Ocean Wind's contract with New Jersey and had far less adverse environmental impact;

- Other alternatives that would relocate turbine conditions, compress turbine layout, and require a redesign of interarray cables because those alternatives would impact the megawatt/hour allowance, which would require additional site investigation and collection and processing of additional survey data and delay the Project for up to 2 years.[105]

---

[105] *See id.* at 2-21 ("Exclusion of WTG positions would lead to a reduced expected annual energy production. For example, removal of the eight 12-MW WTGs under Alternative C-1 could result in a 12.5-percent reduction in expected annual energy production as measured in MW-hours per year in comparison to the Proposed Action. Exclusion of fewer than eight WTGs would not allow Alternative C-1 to provide a buffer between WTGs in the Ocean Wind 1 Lease Area and the Atlantic Shores South Lease Area. Compression of the array layout to 0.99-nm by 0.8-nm spacing under Alternative C-2 could result in an 8-percent reduction in expected annual energy production in comparison to the Proposed Action. Any changes to the stated MW-hour allowance in the June 2019 Order would require the consent of both BPU and Ocean Wind. Alternatives that relocate WTG positions or compress the WTG layout and require redesign of the interarray cables may require additional site investigation. Collecting and processing the additional survey data could lead to a Project delay of up to 2 years.").

79.   Defendants' Environmental Impact Statement acknowledges that the Project will cause serious, adverse environmental impacts, including:

- Significant adverse impacts to commercial fisheries and for-hire recreational fishing;

- Significant adverse impacts on tourism and cultural and historic resources;

- Significant adverse impacts associated with the presence of structures, lighting, and vessel traffic;

- Significant adverse impacts for the North Atlantic right whale and other marine mammals;

- Significant adverse impacts on United States Coast Guard Search and Rescue operations;

- Significant adverse impacts on research and surveys.

80.   Despite the known impacts of approving the Project in the lease area, Defendants impermissibly and summarily dismissed significant, concrete, well-justified, and reasonable alternatives to locating the Ocean Wind 1 Project elsewhere within or outside the lease area offered during the comment process, without adequate explanation, including:

- An alternative that would increase the amount of space between turbines near the Atlantic Shores South lease area;

- Several alternatives that would reduce the number of turbines;

- An alternative that would compress the lease area.

81.   In addition to these recommendations that would have avoided impacts by considering alternatives outside of the lease area, a wide range of reasonable alternative project

layouts, structures, construction methods, and activities within the lease area would have minimized or reduced the Project's adverse environmental impacts.

82.     Thus, the failure to consider alternatives outside or inside of the Project area that would avoid, minimize, and mitigate impacts—including those recommended during public comment—was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law.[106]

**Failure to Properly Analyze the No-Action Alternative**

83.     NEPA requires that the agency's Environmental Impact Statement analyze the No-Action alternative. The No-Action alternative analysis is an agency's analysis of what would happen if the proposed action was not built.[107] The purpose of this analysis is to allow the agency to evaluate the effects of not approving the Project.[108]

84.     Even though the No-Action was "one of three environmentally preferable alternatives,"[109] Defendants' Final Environmental Impact Statement and Record of Decision summarily rejects the No-Action Alternative "because it would not allow for the development of DOI-managed resources and would not meet the purpose and need."[110]

85.     Had the agencies properly defined the Project's purpose and need, they would then have been able to properly analyze the environmental impacts of not approving this Project as designed and proposed.

---

[106] 5 U.S.C. § 706.
[107] 43 C.F.R. § 46.30.
[108] *Id.*
[109] Record of Decision *supra* note 1 at 37.
[110] *Id.*

86.     By defining the Project's purpose and need to preclude the No-Action Alternative, contrary to NEPA's requirements, Defendants' approvals were arbitrary, capricious, and not in accordance with law—and should therefore be invalidated and set aside.

**Failure to Analyze Less Environmentally Damaging Alternatives**

87.     The Final Environmental Impact Statement confirmed that the Ocean Wind 1 project would harm the ecosystem, air quality, bats, benthic resources, birds, sea turtles, coastal habitat and fauna, commercial fisheries and for-hire recreational fishing, cultural resources, demographics, employment, and economics, environmental justice, finfish, invertebrates, and essential fish habitats, land use and coastal infrastructure, marine mammals, navigation and vessel traffic, national security and military, aviation and air traffic, scientific research, recreation and tourism, scenic and visual resources, water quality, and wetlands.[111] Harms identified in the Final Environmental Impact Statement include:

- "[S]hort to long-term impacts on benthic resources,"[112] and "unavoidable entrainment of benthic organisms or their planktonic larvae."[113]

- Navigation issues, collisions with stationary objects, entanglement of gear, fish aggregation, habitat conversion, and vessel collision.[114]

- Adverse impacts that will disrupt commercial fishing, for-hire recreational fishing, and marine recreational businesses and hinder ocean economy sectors.[115]

- "[M]ortality, damage, or displacement of invertebrate organisms"[116] and an increased risk that finfish of all life stages "could experience mortality or developmental issues as a result of noise."[117]

---

[111] *See generally* Final Environmental Impact Statement *supra* note 2 at Appendix L.
[112] *Id.* at 3.6-27.
[113] *Id.* at 3.13-36.
[114] *Id.* at 3.9-52.
[115] *Id.* at Appendix L.
[116] *Id.* at 3.13-35.
[117] *Id.* at 3.13-43.

- "[L]ong-term behavioral disturbance and masking effects on marine mammals"[118] and an increased chance of vessel collisions with marine mammals.

- "Increased navigational complexity for military or national security vessels operating with the Wind Farm Area"[119] and Coast Guard "SAR activities could be hindered within the Wind Farm Area due to navigational complexity and safety concerns. . . . Changing navigational patterns could also concentrate vessels within and around the outside of the Project area," which will cause "space use conflicts in locations or reduce[] the efficiency of SAR operations, resulting in moderate, adverse impacts on SAR operations."[120]

- Impacts to radar equipment that will create "navigational complexity [that] would increase the risk of collision and allisions for military and national security vessels or aircraft within the project area."[121]

- "Unavoidable presence in views from the coastline, with moderate to major effects on seascape character and landscape character."[122]

88.     Despite these known impacts of approving the Project in the lease area, Defendants opted not to consider or analyze any alternative that proposed locating the Project in a different location or significantly reducing the footprint of the Project. The alternatives analyzed in the Final Environmental Impact Statement, alternatives with fewer turbines, more space between turbines, and different cable routes, were rejected by Defendants without any concrete reason. And Defendants impermissibly and summarily dismissed significant concerns over the limited alternatives in the comment process without adequate explanation, including:

- "Instead of presenting any real meaningful alternatives the DEIS merely attempts to give the appearance of having considered a range of alternatives. It concocts several that place a few turbines one way or the other which have the same power level and results in virtually no change in environmental impact as shown in the comparative tables in the DEIS. Therefore for NEPA purposes they are identical

---

[118] *Id.* at 3.15-41.
[119] *Id.* at L-2.
[120] *Id.* at 3.16-16.
[121] *Id.* at 3.17-12.
[122] *Id.* at 3.20-27; *see also id.* at L-2 ("Alterations to the Ocean, seascape, landscape character units' character, and effects on viewer experience, by the wind farm, vessel traffic, onshore landing sites, onshore export cable routes, onshore substation, and electrical connections with the power grid.").

to the proposed action do not represent a "reasonable range" of options and serve no environmental purpose. They are window dressing not real NEPA alternatives. That leaves the no action alternative as the only option . . . . this leaves us with an EIS that includes no reasonable alternatives which is exactly what the Act and its attendant case law forbids. This must be rectified."[123]

- "[A]lternatives described above in section 4 the DEIS must include other reasonable mitigating alternatives such as: A. Turbine exclusion zones from shore based on visual impact adverse impact on historic properties and local climate changes at the shore and B. Turbine exclusion zones away from the primary migration corridor of the right whale to allow its migration to continue in compliance with the Endangered Species Act and the Marine Mammal Protection Act."[124]

- "The Alternative Analysis is fatally flawed because it selected the most impacted site for the cable connection in Barnegat Bay and on land both at Island Beach State Park and Oyster Creek."[125]

89.     Contrary to the stepwise approach required by NEPA, BOEM opted to authorize some monetary compensation for impacts to the fishing industry, historic properties, and cultural resources without adequately evaluating alternatives to avoid, minimize, and reduce environmental impacts rather than allowing the Project sponsor to pay for them.

90.     The lack of a legitimate alternatives analysis and the failure to consider alternatives that would avoid, minimize, or mitigate impacts was arbitrary, capricious, an abuse of discretion, and otherwise unlawful.

**Failure to Analyze Impacts on Migratory Birds**

91.     Even though BOEM recognized the impact to migratory birds, it provided no additional analysis on the impact to species falling under the Migratory Birds Treaty Act.[126] In

---

[123] *Id.* at O.6.2-12.
[124] *Id.* at O.6.2-12-13.
[125] *Id.* at O.6.2-14.
[126] *See* 16 U.S.C. § 703.

fact, migratory birds are only discussed three times in the Final Environmental Impact Statement's section on impacts to birds.

92.     While BOEM received several comments discussing how the analysis in the Draft Environmental Impact Statement fell short in considering both the impacts to migratory birds and the possible mitigation measures to ensure migratory birds would not be impacted,[127] it failed to include additional analysis and mitigation measures in its Final Environmental Impact Statement and Record of Decision. In fact, the only mitigation measure contemplated and included in the Final Environmental Impact Statement and Record of Decision pertains to lighting on the turbines to deter migratory birds from going toward the turbines.

93.     In approving the Construction and Operations Plan, BOEM failed to adequately consider the Ocean Wind 1 Project's impact on migratory birds, consider and adopt mitigation measures and alter the Project to avoid injuring or killing migratory birds. As such, the decision to approve the Construction and Operations Plan was arbitrary, capricious, and not in accordance with law.

**Failure to Adequately Analyze Climate Change Effects of Constructing and Operating the Project**

94.     The Final Environmental Impact Statement does not sufficiently evaluate the Project's impacts to greenhouse gas emissions and climate change. The analysis focuses on partial, project-specific climate impacts in the nearby geographic area but attempts to quantify only emissions offsets from the Project, with limited qualitative descriptions of emissions generated from construction.

---

[127] *See* Final Environmental Impact Statement *supra* note 2 at Appendix O, O.6.6.

95.     There is no evaluation of the activities associated with the supply chain, such as minerals sourcing, component fabrication, and eventual disposal of turbine components in landfills, which would not occur under the No Action Alternative and differ among other alternatives BOEM did or should have considered.

96.     The Final Environmental Impact Statement only compares the Project's climate benefits with "fossil-fuel power generating stations[,]" and does not compare the Project's climate impacts with other alternative renewable energy sources or project locations and designs.

97.     Nor is there any cumulative-level analysis of climate impacts (positive or negative) associated with the proposed scale of offshore wind development.

98.     Because Defendants' Environmental Impact Statement fails to adequately analyze the impacts on the human environment of the Ocean Wind 1 Project, Defendants' authorizations and permits that rely on that Environmental Impact Statement are arbitrary, capricious, and otherwise not in accordance with law, and therefore should be declared unlawful and set aside.

99.     Defendants' actions have deprived Plaintiffs of the procedural protections in NEPA and will irreparably harm Plaintiffs' interests.

### Third Cause of Action

### Violation of the Endangered Species Act and
### the Administrative Procedure Act

100.     Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

101.     Congress enacted the Endangered Species Act (ESA) in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] to provide a program for the conservation of such endangered species and

threatened species."[128] "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."[129]

102.    Congress enacted the Endangered Species Act to implement "The policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes."[130]

103.    Section 7 of the ESA requires that:

Each Federal agency shall, in consultation with and with the assistance of the Secretary, ensure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . .[131]

104.    The Supreme Court describes this statute as a plain, affirmative command that admits of no exception:

One would be hard-pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to ensure that actions authorized, funded, or carried out by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or modification of habitat of such species . . . ." This language admits of no exception.[132]

105.    The regulations promulgated to implement Section 7 of the ESA require that an action agency—here, BOEM—first must determine whether the action "may affect" an endangered or threatened species.[133] If so, the action agency must consult with—applicable here—the National Marine Fisheries Service, which has responsibility for marine species under

---

[128] 16 U.S.C. § 1531(b).
[129] *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978).
[130] 16 U.S.C. § 1531(b).
[131] 16 U.S.C. § 1536(a).
[132] *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (quoting 16 U.S.C. § 1536 (1976)).
[133] 50 C.F.R. § 402.14(a).

the ESA.[134] The Section 7 consultation concludes when the National Marine Fisheries Service issues a Biological Opinion determining whether the proposed action does or does not jeopardize the species.[135] During consultation, the parties cannot make "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures."[136]

106.     The implementing regulations require the Secretary to complete the consultation by issuing a formal Biological Opinion: "[T]he Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."[98] Section 7 requires that a Biological Opinion base its conclusions on the "best scientific and commercial data available."[137] Where the Service finds that the proposed action will jeopardize the species, it must provide an incidental take statement specifying the impacts of the incidental taking to the endangered species and "those reasonable and prudent measures that [the Service] considers necessary or appropriate to minimize such impacts,"[138] and setting forth the "terms and conditions (including but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the [reasonable and prudent measures]. . . ."[139]

107.     When the Service issues a Biological Opinion and an Incidental Take Statement outlining the requirements and conditions that must be met, that constitutes a permit authorizing

---

[134] *Id.*
[135] 16 U.S.C. § 1536(a)(2) & (b)(3)(A).
[136] 16 U.S.C. § 1536(d).
[137] 16 USC §1536(a)(2); 50 CFR § 402.14(g)(8).
[138] 16 U.S.C. § 1536(b)(4)(i)-(ii).
[139] 16 U.S.C. § 1536(b)(4)(iv).

the action agency's permittee to take the endangered species, provided that it respects and adopts the terms and conditions of the Incidental Take Statement.[140] However, if the action agency fails to incorporate all the requirements outlined in the Biological Opinion and Incidental Take Statement in its final approval of a project, then any incidental take is a prohibited take and in violation of the Endangered Species Act.

108.    On April 3, 2023, the Service issued its Biological Opinion, concluding that

> it is our biological opinion that the proposed action is likely to adversely affect but is not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic DPS of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles, shortnose sturgeon, or any of the five DPSs of Atlantic sturgeon. Likewise, the proposed action may adversely affect but is not likely to destroy or adversely modify critical habitat designated for the New York Bight DPS of Atlantic sturgeon. We have determined that the project will have no effect on the Gulf of Maine DPS of Atlantic salmon or critical habitat designated for the North Atlantic right whale, Carolina DPS of Atlantic sturgeon, or the Northwest Atlantic DPS of loggerhead sea turtles.[141]

109.    But in its Biological Opinion, the Service warned BOEM that "[a] failure to implement the proposed action as identified in Section 3 of this Opinion would be a change in the action that may render the conclusions of this Opinion and the take exemption inapplicable to the activities carried out, and may necessitate reinitiation of consultation."[142] Despite the Service's explicit warning, BOEM failed to incorporate all of the Biological Opinion's requirements into its approval of the Construction and Operations Plan for the Ocean Wind 1 Project, invalidating the Service's conclusion that the Project would not jeopardize the North Atlantic right whale and other endangered species.

---

[140] *See Bennet v. Spear*, 520 U.S. 154, 170 (1997).
[141] Biological Opinion *supra* note 60 at 503-504.
[142] Biological Opinion *supra* note 60 at 510.

110.    BOEM's approval of the Ocean Wind 1 Construction and Operations Plan omitted several requirements from the Biological Opinion, including:

- The Biological Opinion requires, as part of the approved action, that "no P[rotected Species Observer] will work more than 4 consecutive hours without a 2-hour break, or longer than 12 hours during a 24 hour period,"[143] and that "each [Protected Species Observer] will be provided one 8-hour break per 24-hour period to sleep."[144] The Record of Decision makes no mention of working longer than 12 hours or providing an 8 hour sleep break and deviate's from the Service's requirements by instead stating that Protected Species Observers "must be on watch for no more than a maximum of 4 consecutive hours, followed by a break of at least 2 hours between watches."[145]

- The Biological Opinion requires, as part of the approved action, that "[a]ll sampling gear [] be hauled at least once every 30 days, and all gear [] be removed from the water and stored on land between survey seasons to minimize risk of entanglement."[146] BOEM's Record of Decision approving the Construction and Operations Plan does not include this requirement.

- The Biological Opinion requires, as part of the approved action, that

  [t]o facilitate identification of gear on any entangled animals, all trap/pot gear used in the surveys would be uniquely marked to distinguish it from other commercial or recreational gear. Using black and yellow striped duct tape, place a 3-foot-long mark within 2 fathoms of a buoy. In addition, using black and white paint or duct tape, place 3 additional marks on the top, middle and bottom of the line. These gear marking colors are proposed as they are not gear markings used in other fisheries and are therefore distinct.

---

[143] Biological Opinion *supra* note 60 at 60.
[144] *Id.*
[145] Record of Decision *supra* note 1 at A-65.
[146] Biological Opinion *supra* note 60 at 95.

Any changes in marking would not be made without notification and approval from NMFS.[147]

BOEM's Record of Decision approving the Construction and Operations Plan completely omit this requirement.

- The Biological Opinion requires, as part of the approved action, that Passive Acoustic Monitoring operators should have a shift of "no more than 3 hours."[148] BOEM's Record of Decision fails to comply with the Biological Opinion by allowing the maximum shift of a Passive Acoustic Monitoring operator to be 4 hours instead of 3.[149]

- The Biological Opinion requires, as part of the approved action, that there be "six to eight visual [Protected Species Observers and Passive Acoustic Monitoring] operators (may be located onshore) on the pile driving vessel and four to eight visual [Protected Species Observers and Passive Acoustic Monitoring] operators on any secondary marine mammal monitoring vessel."[150] BOEM's Record of Decision reduces this requirement by only requiring

    At minimum, four visual PSOs must be actively observing for marine mammals and sea turtles before, during, and after pile driving. At least two visual PSOs must be stationed on the pile driving vessel and at least two visual PSOs must be stationed on a secondary, PSO-dedicated vessel… Concurrently, at least one PAM operator must actively monitor for vocalizing marine mammals before, during and after pile driving.[151]

    BOEM's decision to reduce the number of Protected Species Observers reduces the number of trained professionals looking out for endangered species and

---

[147] *Id.*
[148] *Id.* at 66.
[149] Record of Decision *supra* note 1 at A-65.
[150] Biological Opinion *supra* note 60 at 67.
[151] Record of Decision *supra* note 1 at A-69.

violates the requirements set out in the Biological Opinion and the Incidental Take Statement.

- The Biological Opinion requires, as part of the approved action, post-construction, high-resolution geophysical survey reporting.[152] BOEM's Record of Decision approving the Construction and Operations Plan contains no such requirements.

- The Biological Opinion requires, as part of the approved action, regular fisheries monitoring surveys carried out by Rutgers University, Monmouth University, and Delaware State University.[153] BOEM's Record of Decision omits this requirement.

- The Biological Opinion requires, as part of the approved action, that BOEM implement the submerged aquatic vegetation mitigation plan, dated November 2022.[154] BOEM's Record of Decision fails to incorporate this mitigation plan, as required by the Service, in BOEM's conditions for approval.

- The Biological Opinion requires, as part of the approved action, several requirements for general visual monitoring for HRG surveys, including

  Shutdowns will be conducted for impulsive, non-parametric HRG survey equipment other than CHIRP SBPs operating at frequencies <180 kHz. Monitoring Equipment: two pairs of 7x50 reticle binoculars, one mounted thermal/IR camera system during nighttime and low visibility conditions, two hand-held or wearable NVDs, two IR spotlights, one data collection software system, two PSO-dedicated VHF radios, and one digital single-lens reflex camera equipped with a 300-mm lens. The PSOs will be responsible for visually monitoring and identifying marine mammals approaching or entering the established zones during survey activities. Visual monitoring of the established Shutdown zones and monitoring zone

---

[152] *See* Biological Opinion *supra* note 60 at 80.
[153] *Id.* at 85.
[154] *Id.* at 90.

will be performed by PSO teams on each survey vessel: four to six PSOs on all 24-hour survey vessels, and two to three PSOs on all 12-hour survey vessels. PSOs will work in shifts such that no one PSO will work more than 4 consecutive hours without a 2-hour break or longer than 12 hours during any 24-hour period.[155]

BOEM's Record of Decision and conditions of approval omit the specifics outlined in the Biological Opinion. Instead of including these explicit requirements, BOEM opted to develop a spreadsheet (which was not attached to the Record of Decision) outlining the specifics of the monitoring equipment.[156] The failure to include the specific requirements for monitoring fails to include the Biological Opinion's required measures to avoid jeopardizing the species' continued existence. In addition to the minimization and mitigation measures outlined by Ocean Wind 1's Construction and Operations Plan, the Service's Incidental Take Statement Outlined additional terms and conditions that BOEM was required to incorporate for the Project to be exempt from the prohibitions of Section 9. BOEM also failed to incorporate all the terms and conditions outlined by the Service.

- The Incidental Take Statement requires several conditions for vessels transiting to and from the Paulsboro Marine Terminal, including an annual report of the number of vessels in the terminal per month, reports of any sturgeon observed with injuries or mortalities in the terminal area, and holding any dead sturgeon in cold storage until discusses next steps.[157] BOEM's Record of Decision and its

---

[155] Biological Opinion *supra* note 60 at 76.
[156] Record of Decision *supra* note 1 at A-82.
[157] Biological Opinion *supra* note 60 at 512-513.

conditions of approval for the Construction and Operations Plan omits all of these requirements.

- The Incidental Take Statement requires several conditions for vessels transiting to and from the New Jersey Wind Port, including an annual report of the number of vessels in the terminal per month, reports of any sturgeon observed with injuries or mortalities in the terminal area, and holding any dead sturgeon in cold storage until the Service discusses next steps.[158] BOEM's Record of Decision and its conditions of approval omit all of these requirements.

- The Incidental Take Statement requires BOEM, BSEE, the Corps, and the Service to meet twice annually to review sea turtle observation records, implement the requirements, and facilitate the monitoring of the incidental take exemption for sea turtles.[159] BOEM's Record of Decision fails to incorporate this requirement.

111.    Because BOEM failed to include all the requirements listed in the Biological Opinion and the Incidental Take Statement, BOEM failed to comply with the Endangered Species Act, rendering its approval of the Project arbitrary, capricious, and otherwise not in accordance with the requirements of the Endangered Species Act.

**Endangered Species Will Be Jeopardized By the Ocean Wind 1 Project, as Approved by BOEM**

112.    The approved location of Ocean Wind 1 is directly within the most densely traversed area for the North Atlantic right whale, and dozens of other species of marine animals. These endangered animals live and travel within the area and use the corridor where the Ocean

---

[158] Biological Opinion *supra* note 60 at 513.
[159] Biological Opinion *supra* note 60 at 516.

Wind 1 Project and 13 other offshore wind projects (that are either in construction or planning to be built) will sit, spanning over 168 miles along the coast of the State of New Jersey. These projects will inhibit all aspects of the lives of these endangered marine mammals, sea turtles, and sturgeon, including their migration and breeding patterns. The underwater noise, increased risk of vessel strikes and collisions, and the disruption of habitats and food resources will result in changes in behavior, damage to species, injuries, and even death. The Record of Decision and the Biological Opinion violate the Endangered Species Act because they fail to adequately consider the impacts of the Project, the cumulative impacts of the offshore wind program, and the best scientific data available.

113.     The Service failed to use the best available science and thus underestimated the impacts on the North Atlantic right whale, blue whale, fin whale, sei whale, and sperm whale and failed to consider how the offshore wind program as a whole will injure these endangered species. The Service failed to rely on the best scientific data, as required by Section 7, opting instead to understate the impact of the Project on endangered marine mammals, the harassment and take of which will jeopardize each species' continued existence. As such, the Service violated, and continues to violate, the Endangered Species Act by failing to re-initiate Endangered Species Act Section 7 consultation to ensure that BOEM's approval of the proposed Ocean Wind 1 Project will not jeopardize these federally protected species. These endangered whales will face an increased risk of vessel strikes and entanglement of fishing gear, as well as behavioral changes from pile driving and increased noise in the area.

114.     In addition, the loss of physical space available to the North Atlantic right whale and other endangered species resulting from the construction and operation of the Project, has not been adequately analyzed. Nor have the Project's cumulative effects and the larger plan to

develop commercial wind energy projects up and down the coast been evaluated. With projects covering hundreds of thousands of acres in the Ocean, the Service has failed to consider how continuous offshore wind projects will impact these creatures and their habitats.

115.    The Project will create an influx of vessels in the area once construction starts and will include tugboats, barge cranes, and hopper scows, many of which would be substantially larger and faster than fishing vessels. Neither the Biological Opinion nor the Record of Decision contains any analysis of how the increased number of construction vessels, some of which are hundreds of feet in length, will impact the endangered whale species. Nor is there any analysis of how the hundreds of turbines across the four projects will impact the travel patterns and behavioral patterns of these whales. If there are wind projects in the surrounding hundreds of thousands of acres, where will the whales retreat to avoid increased vessels, construction noises, explosions, and the destruction or displacement of their food? The Service has yet to provide an answer or any analysis answering that question, which indicates the Service's failure to utilize the best available science and data to formulate its opinion.

116.    The Service's failure to adequately consider the dangers to these protected species extends to their failure to require enough mitigation measures to prevent the injury and death of the North Atlantic right whale and other protected species. Even though the Service recognizes that pile driving and construction-related noise will have adverse impacts on endangered whales, the Service simply requires pile driving to cease activity for 60 minutes when a whale is spotted nearby and justifies the use of pile driving and explosions by asserting that the animals will not be impacted long-term because the activities the "will last for no more than four hours at a

time"[160] and the whales will not stay in the area "for any extended period of time."[161]

**The Service Violated the ESA by Failing to Adequately Analyze How the Offshore Wind Projects in New Jersey and New York Will Jeopardize the North Atlantic Right Whale**

117.     The North Atlantic right whale is the most iconic marine mammal on the eastern seaboard of the United States. It is also one of the most imperiled species in the entire world; it is on the verge of extinction.[162] From the time of proposed rule to the issuance of the Incidental Take Regulation, the Service's population estimate decreased from 368 to 338. In fact, there are less than 70 breeding females remaining.[163] Researchers have recorded more deaths among adult females than adult males in recent years, contributing to a steady population decline. Females who undergo energetic stress from reproduction may be more susceptible than males to dying from chronic injuries such as those from entanglement or vessel strikes.[164] Additionally, North Atlantic right whales have experienced stunted growth.[165]

118.     North Atlantic right whales primarily habituate Atlantic coastal waters along the continental shelf, including the site for Ocean Wind 1. In the spring, summer, and early fall, many whales can be found off the coast of New England and Canada, where they feed and mate.[166] NOAA has designated two areas as critical habitats for the North Atlantic right whale:

---

[160] Biological Opinion *supra* note 60 at 269.
[161] *Id.*
[162] National Oceanic and Atmospheric Administration (NOAA), "North Atlantic Right Whale," *NOAA Fisheries: Species Directory* (September 14, 2023),
https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.
[163] *Id.*
[164] Biological Opinion *supra* note 60 at 121.
[165] 31 *Current Biology* 3174-3179 (July 26, 2021): "Decreasing Body Lengths in North American Right Whales," https://www.cell.com/current-biology/fulltext/S0960-9822(21)00614-X.
[166] *Id.*

coastal New England and the southeast coast of the U.S.[167] Right whales migrate seasonally and may travel individually or in small groups.

119.    In recent years, the Service has started creating mitigation programs—voluntary Seasonal Management Areas and Dynamic Management Area Programs—with the hope of protecting the North Atlantic right whale's dwindling population. However, these measures have not been enough to stop these endangered creatures from being struck by vessels or entangled in equipment. There have been several North Atlantic right whale Unusual Mortality Events, which are "stranding[s] that is unexpected; involves a significant die-off of any marine mammal population; and demands immediate response"[168] in recent years. In 2017, there were 17 observed right whale mortalities, and by February 2023, there were 35 confirmed mortalities, 22 serious injuries, and 36 sublethal injuries or illnesses.[169]

120.    Even though the Service and other federal agencies recognize the dire circumstances of the North Atlantic right whale,[170] the Service "disagrees that the authorized take of 14 North Atlantic right whales by Level B harassment incidental to the Project will have a non-negligible impact on the species."[171]

121.    However, in 2022 BOEM and NOAA issued a joint draft, "North Atlantic Right Whale and Offshore Wind Strategy."[172] In that draft strategy, NOAA (the Service is an office

---

[167] National Oceanic and Atmospheric Administration (NOAA), "North Atlantic Right Whale," *NOAA Fisheries: Species Directory* (September 14, 2023), https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.
[168] 16 U.S.C. § 1361.
[169] Biological Opinion *supra* note 60 at 120.
[170] *See* BOEM and NOAA's Draft Strategy on the North Atlantic right Whale and Offshore Wind, https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NAR W_OSW_Strategy.pdf.
[171] 88 Fed. Reg. 176, 62918 (Sept. 13. 2023).
[172]*See* BOEM and NOAA's Draft Strategy on the North Atlantic Right Whale and Offshore Wind,

within NOAA) recognized its responsibility to the North Atlantic right whale and the need to protect North Atlantic right whales because they have low resilience to "future perturbations."[173] The strategy confirmed the dire condition of this species, and the agencies admitted:

- "The potential biological removal [] level for the species, defined as the maximum number of animals that can be removed annually while allowing the stock to reach or maintain its optimal sustainable population level, is less than 1[,]"[174]

- "[V]essels of nearly any size can injure or kill a right whale[,]"[175]

- "In addition to vessel strikes and entanglement in fishing gear, which are the primary causes of NARW mortality and serious injury, modeling indicates that low female survival, a male-biased sex ratio, and low calving rates are contributing to the population's current decline. The species has low genetic diversity, as would be expected based on its low abundance, and the species' resilience to future perturbations is expected to be very low."[176]

122.   The Draft Strategy also discusses the Unusual Mortality Event and clarifies that a majority of the deaths and injuries resulted from vessel strikes or entanglements. The Service examined 23 of the 35 dead whales and found that for all 23, vessel strikes and entanglements caused the death.[177] Additionally, "20 live free-swimming non-stranded whales have been documented with serious injuries from entanglements or vessel strikes, and 36 more have been

---

https://www.boem.gov/sites/default/files/documents/environment/BOEM_NMFS_DRAFT_NAR W_OSW_Strategy.pdf.

[173] *Id.*

[174] *Id.* at 5.

[175] *Id.*

[176] *Id.* at 5 (internal citations removed).

[177] *Id.* at 6.

documented with sublethal injuries."[178] Further, the Service and BOEM admit that "[t]o date, more than 20 percent of the population has been impacted by the [Unexplained Mortality Event] based on the documented cases and the 2017 abundance estimate, which is when the [Unexplained Mortality Event] began. The actual situation is certainly much worse, with cryptic mortality (unobserved mortality) estimated to be 64% of all mortality."[179]

123.    Even though BOEM and the Service/NOAA have published strategies documenting the very possible extinction of this species,[180] neither the Final Environmental Impact Statement, Biological Opinion, nor the Record of Decision contemplates this severe risk to the North Atlantic right whales. It strains credulity for the agencies to report in one document that this species has high mortality rates from vessel strikes and entanglements, is dwindling in numbers, and that the biological removal for this species is at one and then in the reports approving this Project, which will increase the risk of vessels and entanglements and increases the mortality risk for these whales, say that these whales will not be jeopardized.

124.    Additionally, the Incidental Take Regulation and the Letter of Authorization fail to evaluate and consider how the Offshore Wind projects, in totality, will risk the continued existence of this species. Combined, the proposed projects off the coasts of New Jersey and New York will have detrimental and species-altering impacts to the Right whale. As Plaintiff Clean Ocean Action's comments to the proposed Incidental Take Regulations say:

> NMFS has issued Incidental Harassment Authorizations ("IHA"), including for the North Atlantic Right whale, for offshore wind projects in the Atlantic Ocean. Regarding just the Empire Wind 1 & 2, Atlantic Shores 1 & 2, and Ocean Wind 1 & 2 projects off the New Jersey and New York coasts, the combined number of authorized takes on the North Atlantic Right whale is 179 to date. *This number of*

---

[178] *Id.*
[179] *Id.*
[180] *See id.* at 6-8.

*takes accounts for over 53% of the North Atlantic Right whale individuals remaining on Earth.*[181]

125.    In failing to analyze how the offshore wind energy program as a whole, the environmental review of which has been fast-tracked, will impact the North Atlantic right whale and other ESA-protected species, and failing to require the prescribed measures to protect against their extinction, Defendants have violated the Endangered Species Act. Their approval of the Ocean Wind 1 Construction and Operations Plan, and failure to re-initiate consultation under Section 7 of the Endangered Species Act are final agency actions that are arbitrary, capricious, and otherwise not in accordance with the law—and should be found unlawful, invalidated, and set aside.

126.    Defendants' actions have deprived the Plaintiffs of the substantive and procedural protections in the Endangered Species Act and will irreparably harm Plaintiffs' interests.

### Fourth Cause of Action

### Violation of the Marine Mammal Protection Act and the Administrative Procedure Act

127.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

128.    The Marine Mammal Protection Act (MMPA) was the first national legislation to mandate an ecosystem-based approach to marine resource management. Under the Marine Mammal Protection Act, Congress directed that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when

---

[181]Public Comments Received on Ocean Wind 1 Proposed Action, *Comment from Clean Ocean Action*, https://www.fisheries.noaa.gov/s3/2023-09/OceanWind1-FinalRule-PubComments-OPR1.pdf (emphasis added).

consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine mammals.

129.    In 2018, Congress enacted a general moratorium on the take of marine mammals without a permit: "There shall be a moratorium on the taking and importation of marine mammals and marine mammal products, commencing on the effective date of this chapter, during which time no permit may be issued for the taking of any marine mammal and no marine mammal or marine mammal product may be imported into the United States except in the following cases. . . ."[182]

130.    The permit exception to this moratorium provides that "upon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of small numbers of marine mammals of a species or population stock" if the Secretary "finds that the total of such taking during each five-year (or less) period concerned will have a negligible impact on such species or stock. . . ."[183]

131.    The Marine Mammal Protection Act also prohibits persons or vessels subject to the jurisdiction of the United States from taking any marine mammal in waters or on lands under the jurisdiction of the United States or on the high seas.[184] The baseline under the MMPA is that "no permit may be issued for the taking of any marine mammal."[185] That said, the Service is permitted to authorize the incidental take of only "small numbers of marine mammals of a

---

[182] 16 U.S.C. 1371(a)(1).
[183] 16 U.S.C. 1371(5)(a).
[184] 16 USC 1372(a)(l)-(2).
[185] 16 U.S.C. § 1371.

species or population stock."[186] Under the MMPA, "take" means to "harass, capture, hunt, kill, or attempt to harass, capture, hunt, or kill any marine mammal."[187]

132.    In deciding whether to issue an Incidental Take Authorization under the Marine Mammal Protection Act, the Secretary of Commerce is required to "give full consideration to all factors which may affect the extent to which such animals may be taken[,]"[188] including:

> (1) [E]xisting and future levels of marine mammal species and population stocks;
>
> \*       \*       \*
>
> (3) [T]he marine ecosystem and related environmental considerations;
> (4) [T]he conservation, development, and utilization of fishery resources; and
> (5) [T]he economic and technological feasibility of implementation.[189]

133.    On July 3, 2023, the Service issued its Record of Decision, and on September 15, 2023, issued its final Incidental Take Regulations and Letter of Authorization, authorizing the take/harassment of several marine mammal species under the Ocean Wind 1 Project: the North Atlantic right whale, Blue Whale, Fin Whale, Humpback Whale, Minke Whale, Sei Whale, Atlantic Spotted Dolphin, Atlantic White-Sided Dolphin, Common Bottlenose Dolphin, Short-Beaked Common Dolphin, Long-Finned Pilot Whale, Short-Finned Pilot Whale, Risso's Dolphin, Harbor Porpoise, Gray Seal, and Harbor Seal.

134.    In total, the Service authorized a maximum of 6,601 harassment takes in any one-year[190] and 13,046 harassment takes over the course of the five-year permit.[191] Of the marine mammals where harassment takes were authorized, five are species listed under the Endangered

---

[186] 16 U.S.C. § 1371.
[187] 16 U.S.C. § 1362(13).
[188] 16 U.S.C. § 1373(b).
[189] 16 U.S.C. § 1373(b)(1), (3)-(5).
[190] 88 Fed. Reg. 176, 62953 (Sept. 13, 2023).
[191] 88 Fed. Reg. 176, 62952 (Sept. 13, 2023).

Species Act: North Atlantic right, blue, fin, sei, and sperm whales. For the North Atlantic right whale, the Service authorized seven annual takes and 14 overall. For the bottlenose dolphin (coastal stock), the Service authorized the take of 4,308 individuals, or 21.3% of the population. Even though the maximum number of harassments is in the thousands, the Service classifies these incidental harassment takes as small.[192]

135.   The Service's final decision, Letter of Authorization, and implementing regulations were arbitrary, capricious, and not in accordance with law because they fail to comply with the Marine Mammal Protection Act and its implementing regulations, allow the take of a substantial, non-negligible, number of marine mammals, including North Atlantic right whales, bottlenose dolphins, and harbor seals; fail to use the best available science; fail to analyze the cumulative effects of other approved and proposed offshore wind projects; fail to analyze the vessel strikes caused by Project obstructions; and fail to analyze take resulting from interference with migration routes, breeding, feeding, and calving.

136.   The Environmental Impact Statement supporting the Service's issuance of its Letter of Authorization states that, in addition to the temporary impacts of pile driving noise from the project, the placement of structures in the project would have a long-term, negative impact on marine mammals, including the endangered North Atlantic right whale:

> The effect of the increased presence of structures on marine mammals and their habitats is likely to be negative, varying by species, and their significance is unknown. The presence of structures could also concentrate recreational fishing around foundations, potentially increasing the risk of marine mammal entanglement in both lines and nets and increasing the risk of injury and mortality due to infection, starvation, or drowning (Moore and van der Hoop 2012).[193]

---

[192] 88 Fed. Reg. 62899 (Sept. 13, 2023) ("The request was for the incidental, but not intentional, taking of a small number of 17 marine mammal species (comprising 18 stocks) by Level B harassment and by Level A harassment (10 species or stocks).").
[193] Final Environmental Impact Statement *supra* note 2 at 3.15-32.

137.    Of particular importance, Defendants themselves stated that project impacts on North Atlantic right whales would be significant and noted that "impacts on individual [North Atlantic right whales] could have severe population-level effects and compromise the viability of the species due to their low population numbers and continued state of decline[.]"[194] By allowing the take of 14 North Atlantic right whales over five years, a species whose population has already dwindled below 350 individuals,[195] in a project that is anticipated to have a moderate to major impact on North Atlantic right whales, the Service failed to ensure that the level of take will "have a negligible impact" on North Atlantic right whales, in violation of the Marine Mammal Protection Act and Administrative Procedure Act.

138.    Because Defendants' issuance of the Letter of Authorization and regulations allows the significant take of various marine mammals—especially the highly endangered North Atlantic right whale—Defendants' purported authorization of this take of these species is arbitrary, capricious, and otherwise not in accordance with law and should be ruled unlawful and set aside.

139.    Defendants' actions have deprived the Plaintiffs of the procedural and substantive protections in the Marine and Mammals Protection Act and threaten to irreparably harm the Plaintiffs' interests.

**Fifth Cause of Action**

**Violation of the Migratory Bird Treaty Act
and the Administrative Procedure Act**

---

[194] *Id.* at S-15.
[195] *See* North Atlantic Right Whale, https://www.fisheries.noaa.gov/species/north-atlantic-right-whale (last viewed, Sept. 13, 2023) (also noting that North Atlantic Right whales have been experiencing "an ongoing Unusual Mortality Event since 2017).

140.   Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

141.   The Migratory Bird Treaty Act[196] prohibits the take—the killing, capturing, selling, trading, and transportation—of protected migratory bird species.[197] The Act applies broadly to the killing of any migratory bird "at any time, by any means or in any manner."[198]

142.   The mid-Atlantic coast "is a major route for migratory birds."[199] A broad group of avian species pass through Ocean Wind 1's lease area each year, including migrants, coastal birds, and marine birds.[200] The migration of these birds is notable, "with an average of nearly 800,000 birds counted annually at the Avalon Seawatch—Cape May Bird Observatory."[201] Around 159 species travel through the area, which includes nine state-listed endangered species, four state-listed threatened species, 19 state-listed special concern species, two federally-listed threatened species, and one federally-listed endangered species.[202]

143.   The Ocean Wind 1 Project will take a significant number of migratory birds "primarily associated with habitat loss and collision-induced mortality from the rotating [turbines][,]"[203] and "[m]igratory birds that use the offshore wind lease areas [Ocean Wind 1 and others] during all or parts of the year would either be exposed to new collision risk or experience long-term functional habitat loss due to behavioral avoidance and displacement from the wind lease area."[204]

---

[196] 16 U.S.C. § 703.
[197] *Id.*
[198] 16 U.S.C. § 703(a).
[199] Final Environmental Impact Statement *supra* note 2 at 3.7-1.
[200] *Id.* at 3.7-3.
[201] *Id.*
[202] *Id.*
[203] *Id.* at 2-46.
[204] *Id.* at 3.7-16.

144.    In approving the Construction and Operations Plan, BOEM failed to adequately consider the impact the Ocean Wind 1 Project will have on migratory birds, consider and adopt mitigation measures, and alter the Project to avoid injuring or killing migratory birds. As such, the decision to approve the Construction and Operations Plan was arbitrary, capricious, and not in accordance with law.

145.    Because the Ocean Wind 1 Project will take migratory birds, in clear violation of the Migratory Bird Treaty Act, Defendants' approval of the Project is arbitrary, capricious, and not in accordance with law. This approval should therefore be invalidated and set aside.

146.    Defendants' actions have deprived Plaintiffs of the substantive and procedural protections in the Migratory Bird Treaty Act and will irreparably harm Plaintiffs' interests.

**Sixth Cause of Action**

**Violation of the Coastal Zone Management Act
and Administrative Procedure Act**

147.    Plaintiffs reallege and incorporate by reference all of their previous allegations and further allege as follows:

148.    The Coastal Zone Management Act ("CZMA") requires that "[e]ach federal agency conducting or supporting activities directly affecting the coastal zone shall conduct or support those activities in a manner which is, to the maximum extent practicable, consistent with approved state management programs."[205] The Coastal Zone Management Act further requires that, for federal activities in the Outer Continental Shelf, "all federal license or permit activities . . . which affect any coastal use or resource are conducted in a manner consistent with

---

[205] 16 U.S.C. § 1456(c)(1).

approved management programs."[206] Violations of the CZMA by Federal agencies are reviewed under the Administrative Procedure Act.

149.    Defendants' approval of the Ocean Wind 1 Project fails to comply with the requirements of the Coastal Zone Management Act because the Project as approved is not consistent with New Jersey's approved coastal management programs and policies in numerous respects. New Jersey's Coastal management rules discourage "[a]ny activity that would adversely impact the natural functioning of marine fish, including the reproductive, spawning and migratory patterns or species abundance or diversity of marine fish,"[207] as well as, "any activity that would adversely impact any New Jersey-based marine fisheries or access thereto[.]"[208] Yet, as detailed in the Environmental Impact Statement and other portions of the administrative record, the Project will severely disrupt the natural functions of many species of fish and other marine organisms, and drastically limit the access and catch available to Cape May's commercial fishing and fish processing operations—particularly finfish, squid, surf clams, and others.

150.    Defendants' approval of the Project was arbitrary, capricious, and not in accordance with law because it relied on speculative, un-specified mitigation actions and compensation programs to offset impacts on New Jersey's fishing industry and Historic Properties that are inconsistent with New Jersey's coastal management rules, policies, and goals in violation of the CZMA.

---

[206] 15 C.F.R. § 930.70.
[207] *See* NJDEP 7:7-16.2.
[208] *See* NJDEP 7:7-16.2.

151.    Defendants' approval of the Ocean Wind 1 Project should therefore be held unlawful and set aside because it is arbitrary, capricious, and otherwise not in accordance with law.

152.    Defendants' approval of the Ocean Wind 1 Project was arbitrary, capricious, and not in accordance with law because it approved the Project, which includes installation of three massive cable routes through New Jersey State waters, before necessary Clean Water Act and Rivers and Harbors Act permits, including required mitigation measures, had been issued by the Corps—so Defendants could not ascertain whether the discharges and obstructions to be authorized did, in fact, comply with New Jersey's coastal programs and policies.

153.    Defendants' actions have deprived Plaintiffs of the substantive and procedural protections in the CZMA and will irreparably harm Plaintiffs' interests.

## Seventh Cause of Action

### Violation of the National Historic Preservation Act
### and Administrative Procedure Act

154.    Plaintiffs reallege and incorporate by reference all of its previous allegations and further allege as follows:

155.    The County of Cape May is home to at least three historic districts and multiple historic properties listed in or eligible for listing in the National Register of Historic Places that are inescapably connected to their historic Atlantic Ocean Viewshed. The high degree of natural and historic integrity of these districts and properties depends upon the unobstructed views of the ocean context in which they were built.

156.    The Cape May Historic District, which is within the County of Cape May, is a National Historic Landmark, the highest level of significance that the federal government bestows upon historic properties. The district, located in the City of Cape May and abutting the

Atlantic Ocean on one side, is known for its vast collection of well-preserved Victorian architecture. The district is one of the largest collections of nineteenth-century buildings in the United States and is considered by architectural historians to be "a textbook of vernacular American architecture." The district includes seventy contributing historic structures, notably including the George Allen House, the Chalfonte Hotel, and Congress Hall, the last of which was used by Benjamin Harrison as his summer office while President of the United States.

157.    The County of Cape May's second historic district, known as the Ocean City Residential Historic District, was built in the nineteenth century as a religious resort, and the district was listed in the National Register of Historic Places in 2003. The district contains over one hundred contributing properties, and it is well known for its concentration of homes built in Victorian, Colonial Revival, and Craftsman styles. Today, it remains a residential district and serves as one of the only surviving examples of the religious resorts popular in the late nineteenth century. The district also includes the historic Ocean City Music Pier and the National Register-listed Flanders Hotel, both of which face the ocean and whose historical significance is tied to their unobstructed ocean views.

158.    The County of Cape May's third historic district, known as the Wildwoods Historic District, is listed in the New Jersey Register of Historic Places and is eligible for listing in the National Register of Historic Places. The Wildwoods spans two miles through Wildwood Crest, largely featuring motels built, designed, and marketed to showcase Wildwood's beaches and waterfront with pristine ocean views. Many of the properties are built as close as possible to the waterfront to facilitate guests' ability to enjoy the Atlantic Ocean beaches and views. Two of these properties, the Chateau Bleu Motel and the Caribbean Motel, are listed in the National

Register of Historic Places. The latter of these, the Caribbean Motel, was the first motel ever recognized on the National Trust for Historic Preservation's Historic Hotels of America list.

**Violation of Section 106 of the National Historic Preservation Act**

159.    Section 106 of the National Historic Preservation Act of 1966 (NHPA)[209] requires federal agencies to consider the effects on historic properties of projects they carry out, assist, fund, permit, license, or approve throughout the country. If a federal or federally-assisted project has the potential to affect historic properties, a Section 106 review is required.

160.    Section 106 gives interested parties and the public the chance to weigh in on these matters before a final decision is made. This process is an important tool for citizens to lend their voice in protecting and maintaining historic properties in their communities.

161.    Congress enacted the NHPA in recognition of development threats to the nation's irreplaceable historic properties, which include buildings, sites, objects, and their associated landscapes, because of their connection to our sense of orientation as a community and identity as an American people.[210]

162.    Section 106 prohibits federal agencies, such as BOEM, from approving any undertaking unless the agency takes into account the effects of the undertaking on historic properties and resolves adverse effects on those properties.[211] Section 106 requires federal agencies to complete the Section 106 review process "prior to the approval" of the federal undertaking.[212]

---

[209] 54 U.S.C. §§ 100101 to 307101; 36 C.F.R. Part 800.
[210] Section 1 of the NHPA, Pub. L. No. 89-665, amended by Pub. L. No. 96-515.
[211] 54 U.S.C. § 306180.
[212] *Id.*; *see also* 36 C.F.R. § 800.1(c).

163.     Ocean Wind 1 is an undertaking and therefore subject to Section 106 of the NHPA.

164.     BOEM, as the lead federal agency in charge of Ocean Wind 1's permitting review, failed to identify all historic properties that Ocean Wind 1 could adversely affect. At the outset of permitting, BOEM impermissibly and arbitrarily narrowed the scope of its review of historic properties, resulting in a failure to properly identify all historic properties in the Project area.

165.     In approving Ocean Wind 1, BOEM failed to comply with the requirements of Section 106 of the National Historic Preservation Act in numerous respects, including:

- BOEM failed to assess adverse effects, including all direct, indirect, and cumulative effects, including adverse economic effects, to all historic properties in the County of Cape May as Section 106 requires.

- BOEM failed to conduct adequate visual simulations in violation of its own guidelines, precluding meaningful consultation with the County of Cape May and all other consulting parties, and failed to correct errors raised by the County of Cape May concerning BOEM's visual simulation methodology.

- BOEM should have determined avoidance, minimization, and mitigation measures based on the adverse effects of Ocean Wind 1's Construction and Operations Plan, which included, *inter alia*, paint color, turbine array, and automatic detection lighting systems. BOEM should have resolved actual adverse effects on all historic properties, rather than wrongfully considering these industry standard design features as "avoidance and minimization measures."

- To comply with Federal Permitting Dashboard FAST-41's arbitrary deadlines, BOEM executed an illusory Memorandum of Agreement (MOA) that failed to

resolve adverse effects to all historic properties and called for the future

development of "Historic Preservation Treatment Plans," which violates Section

106's requirement that adverse effects be avoided, minimized, or mitigated prior

to approval of the undertaking.

- BOEM also failed to consult with property owners whose cooperation is

  necessary to ensure compliance with mitigation measures required by the MOA

  and in violation of the Advisory Council of Historic Preservation's guidance that

  requires mitigation to be feasible and in the public interest, resulting in a proposal

  to provide mitigation for a mere seven (7) historic properties within the County of

  Cape May even though hundreds of historic properties will be affected—

  including the Cape May Historic District—therefore failing to consider the

  County of Cape May's objections and resolve adverse effects.

166.    Authorizing the Project without Section 106 compliance amounted to bad faith as

well as a pretextual justification for Ocean Wind's permit that was arbitrary, capricious, and

contrary to law.

167.    As a result of Ocean Wind 1's actions, Plaintiffs have and will suffer damages to

its historic properties, property values, tax revenues, and local economy.

**Violation of Section 110(f) of the National Historic Preservation Act**

168.    Section 110(f) requires that BOEM use all possible planning to minimize harm to

National Historic Landmarks, a higher level of scrutiny than Section 106 provides.[213]

169.    Section 110(f) provides: "Prior to the approval of any Federal undertaking that

may directly and adversely affect any National Historic Landmark, the head of the responsible

---

[213] 54 U.S.C. § 306107.

federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark."[214]

170.    BOEM failed to comply with Section 110(f)'s heightened standard of review for National Historic Landmarks by not engaging in all possible planning to minimize harm because it failed to conduct adequate visual simulations, failed to assess adverse effects, including cumulative effects, and failed to resolve adverse effects to all National Historic Landmarks, including the Cape May Historic District, and individually designated National Historic Landmarks within the districts.

171.    In purporting to comply with Section 110(f), BOEM failed to properly consult with the National Park Service regarding ways to minimize harm, relying instead on the purported mitigation measures it developed for NEPA and Section 106 purposes, even though NEPA and Section 106 have lower standards of review than Section 110(f) requires.

172.    BOEM did not consult with the National Park Service about the Cape May Historic District, a National Historic Landmark, as Section 110(f) of the NHPA requires even though it falls within the Project's area of potential effect and is likely to experience adverse effects, and in violation of Section 110(f)'s mandate that federal agencies must use "all possible planning to minimize harm" to National Historic Landmarks such as the Cape May Historic District.

173.    BOEM's authorization of the Project without Section 110(f) compliance amounted to bad faith as well as a pretextual justification for Ocean Wind's permit that was arbitrary, capricious, and contrary to law.

---

[214] *Id.*

174.     As a result of BOEM's actions, Plaintiffs County of Cape May and County of Cape May Chamber of Commerce have and will suffer damages to its historic properties, property values, tax revenues, and local economy.

**Prayer for Relief**

Plaintiffs, the County of Cape May, New Jersey, the County of Cape May Chamber of Commerce, Clean Ocean Action, the Garden State Seafood Association, the Greater Wildwood Hotel & Motel Association, LaMonica Fine Foods, Lund's Fisheries, and Surfside Seafood Products, ask the Court for the following relief:

1.     An order holding unlawful, vacating, and setting aside Defendants' July 3, 2023 decision approving the Construction and Operations Plan for the Ocean Wind 1 Project, and Incidental Harassment Authorization, as arbitrary, capricious, and otherwise not in accordance with law;

2.     Reasonable attorneys' fees and costs for bringing this suit; and

3.     Such other and further relief as the Court deems appropriate.


Dated: October 16, 2023                    Respectfully submitted,


                                           s/Jeffrey R. Lindsay
                                           Jeffrey R. Lindsay
                                           Michael J. Donohue
                                           County of Cape May Department of Law
                                           William E. Sturm, Jr. Administration
                                           Building
                                           4 Moore Road
                                           Cape May Court House, NJ 08210
                                           (609) 465-1062
                                           jeffrey.lindsay@co.cape-may.nj.us
                                           mike@blaneydonohue.com

Roger J Marzulla (pro hac vice pending)
Nancie G. Marzulla (pro hac vice pending)
Marzulla Law, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, D.C. 20036
(202) 822-6760
roger@marzulla.com
nancie@marzulla.com

Gregory A. Werkheiser (pro hac vice pending)
Marion F. Werkheiser (pro hac vice pending)
William J. Cook (pro hac vice pending)
Cultural Heritage Partners, PLLC
1811 East Grace Street
Suite A
Richmond, VA 23223
(202) 567-7594
greg@culturalheritagepartners.com
marion@culturalheritagepartners.com
will@culturalheritagepartners.com

Counsel for Plaintiffs